JOEL A. GOLDMAN, SBN 41367
 *JGoldman@ClarkTrev.com*
CLARK & TREVITHICK
800 Wilshire Blvd., 12th Floor
Los Angeles, California 90017
Telephone: (213) 629-5700
Facsimile: (213) 624-9441

LEWIS R. LANDAU, SBN 143391
 *Lew@Landaunet.com*
ATTORNEY-AT-LAW
22287 Mulholland Highway, Ste. 318
Calabasas, California 91301
Telephone: (888) 822-4340
Facsimile: (888) 822-4340

Attorneys for Defendants John C. Kirkland,
Poshow Ann Kirkland as Trustee of the Bright
Conscience Trust dated September 9, 2009

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| In re,<br><br>EPD Investment Company, LLC and Jerrold S. Pressman,<br><br>Debtors,<br><hr>Jason M. Rund, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>John C. Kirkland, an individual and Poshow Ann Kirkland, solely as Trustee of the Bright Conscience Trust Dated September 9, 2009,<br><br>Defendants. | CASE NO. 2:18-cv-08317-DSF<br><br>**NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS THOMAS P. JEREMIASSEN; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JOEL A. GOLDMAN**<br><br>**Motion #4**<br><br>Date:      May 21, 2019<br>Time:      3:00 p.m.<br>Dept.:      7D<br><br>Assigned to Hon. Dale S. Fischer<br><br>Trial Date:   June 25, 2019 |

2408674.1 (18737.001)

**TO JASON M. RUND, CHAPTER 7 TRUSTEE FOR EPD INVESTMENT COMPANY, LLC AND JERROLD S. PRESSMAN, ("RUND") AND HIS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on May 21, 2019, at 3:00 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Dale S. Fischer, located in the United States Courthouse, 350 W. 1st Street, Los Angeles, California, John C. Kirkland ("Kirkland") and the Bright Conscious Trust, by and through its Trustee Poshow Ann Kirkland ("BC Trust", jointly "Defendants") will and hereby does move this Court for an order that Plaintiff Jason M. Rund's ("Plaintiff" or "Rund") purported expert witness Thomas P. Jeremiassen ("Jeremiassen") be prohibited from testifying at trial. Jeremiassen's exclusion is necessary because the witness has a direct financial stake in the outcome of the litigation, and his compensation is contingent on the outcome of the case.

This motion will be made pursuant to Federal Rules of Evidence Rules 402, 403, and 702, and the principles expressed in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and on the grounds that the expected testimony is not reliable because the witness has a direct financial interest in the outcome of the case, and allowing his testimony would be in violation of public policy.

On April 23, 2019, the parties met and conferred regarding the subject of this motion. No agreement was reached.

/ / /

/ / /

/ / /

2408674.1 (18737.001)

NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS
THOMAS P. JEREMIASSEN

1    This Motion is based on this Notice of Motion, the attached Memorandum of

2  Points and Authorities, the Declaration of Joel A. Goldman filed concurrently

3  herewith, all of the pleadings, files, and records in this proceeding, all other matters

4  of which the Court may take judicial notice, and any argument or evidence that may

5  be presented to or considered by the Court prior to its ruling.

6

7  DATED:  April 30, 2019              CLARK & TREVITHICK

8

9

10                                 By:  ___/s/ Joel A. Goldman_____

11                                      Joel A. Goldman
                                       Attorneys for Defendants John C. Kirkland,
12                                     Poshow Ann Kirkland as Trustee of the
                                       Bright Conscience Trust dated September
13                                     9, 2009

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   Introduction

Testimony of expert witnesses whose compensation is contingent upon the outcome of a case must be excluded.  The logic of exclusion extends beyond experts retained on a contingency fee basis, because permitting the testimony of any expert with a direct financial stake in the outcome of the litigation is against public policy. Once the expert obtains a direct financial interest in the outcome of the litigation—whether by contingency arrangement, or otherwise—any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded.  Under those circumstances, the conflict of interest is so great, and raises so many serious questions about the integrity of the witness's expert testimony, that to admit the conflicted testimony would violate public policy.

Here, Plaintiff has chosen as his expert witness someone who has charged more than a million dollars to the bankruptcy estate, including, but not to, his expert witness fees in this adversary proceeding. Thomas P. Jeremiassen ("Jeremiassen"), has a direct financial interest in the outcome of this case, because the $884,758.39 in expert witness fees and expenses that his firm has been paid by the bankruptcy estate are subject to disgorgement if Defendants prevail in this case. In addition, Jeremiassen is owed at least another $150,000, which will not be paid unless Plaintiff is successful in defeating the lien of the Bright Conscience Trust on all assets of the estate.

Because Jeremiassen's $1,034,758 in fees are contingent on the outcome of the litigation, he has a conflict of interest. Because Jeremiassen has over $1 million at risk, and to protect the integrity of these proceedings, his testimony must be excluded.

## II.   Jeremiassen's Ability To Retain And Recover His Fees Are Contingent On The Outcome Of This Adversary Proceeding

Poshow Ann Kirkland, as Trustee of the Bright Conscious Trust Dated September 9, 2009 ("BC Trust"), is the senior secured creditor of the consolidated estate of Debtors EPD Investment Co., LLC ("EPD") and Jerrold Pressman

1  ("Pressman").  The BC Trust has filed proofs of claim stating that it holds a perfected,

2  first-position secured claim on all assets of the estate, which Plaintiff Jason M. Rund

3  ("Plaintiff" or "Rund") seeks to disallow or equitably subordinate by the instant

4  adversary proceeding.

5      The BC Trust's secured claim, including over a decade of default interest, is

6  well in excess of $10 million.  However, the estate has less than $9 million in assets,

7  consisting of $3.62 million from the sale of shares of stock, $1.25 million from

8  settlements with two law firms, and $3.81 million from recovery of fraudulent

9  transfers.

10     As of December 2017, administrative expenses of over $6 million have

11  substantially exhausted the assets of the estate.  (See Case No. 2:10-bk-62208-ER,

12  Doc. 1225, at p. 25.)  These expenses consist primarily of fees charged by Plaintiff

13  and his law firm.[1]

14     Administrative expenses charged to the bankruptcy estate also include

15  $884,758.39 in expert witness fees and expenses of Jeremiassen's firm Berkley

16  Research Group, LLC ("BRG").  *See* 12/18/13 Order, Case No. 2:10-bk-62208-ER,

17  Doc. 852, p. 3 ("BRG is allowed fees of $602,680.90 and expenses of $354.87 as

18  Chapter 7 administrative expenses on an interim basis for the period from April 10,

19  2012 through October 31, 2013."); 10/06/15 Order, Case No. 2:10-bk-62208-ER,

20  Doc. 1146, p. 2 ("BRG is allowed fees of $278,496.00 and expenses of $3,226.62, for

21  a total of $281,722.62, as Chapter 7 administrative expenses on an interim basis for

22  the period from November 1, 2013 through July 31, 2015.")  As of December 2017,

23  Jeremiassen had incurred an additional $150,000 in fees.  *See* Jeremiassen Depo. at

24

25

26

27

28

---

[1] In addition, Rund filed a tax return for EPD stating that it was a Ponzi scheme, resulting in a large tax lien being filed against the estate.  As a result, anything left after payment of the BC Trust's secured claim and Rund's fees will go to the priority claim of the IRS. The unsecured creditors have been wiped out by the bankruptcy trustee's actions, and will never see a penny.

NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS
THOMAS P. JEREMIASSEN

1   22:15-20 ("Q Do you happen to recall what your billing to date is from and after the

2   second fee app period?  A For the firm, for BRG?  Q Correct. And when I say "you,"

3   I'm referring to the firm.  A I believe it's roughly $150,000.").  Such fees and expenses

4   do not relate solely to the adversary proceeding, but are for all work performed by

5   Jeremiassen in the entire EPD bankruptcy case.  *See* Jeremiassen Depo. at 22:24-35

6   ("the billing is for the whole bankruptcy case").

7          Because the BC Trust has asserted a secured lien on all assets of the bankruptcy

8   estate, the fees of Jeremiassen and the others have been allowed only on an interim

9   basis, and they are subject to final approval and possible disgorgement if the BC Trust

10  prevails in the instant adversary proceeding.  *See* 8/06/14 Ruling, Case No. 2:10-bk-

11  62208-ER, Doc. 1051, pp. 4-5 ("As the Court noted in its prior Tentative Ruling

12  approving the Interim Fee Applications, the respective fees are subject to final

13  approval and possible disgorgement.  The interim fee award status has not changed.

14  Accordingly, the Trustee is authorized to use Estate funds to make the requested

15  disbursements.  However, in light of the unresolved appeals and pending litigation,

16  the Court will not be lightly persuaded by equitable arguments from the Professionals

17  in the face of possible disgorgement.").[2] Jeremiassen acknowledged at his deposition

18  _____

19  [2] "Generally, a debtor's bankruptcy assets are subject to all liens and encumbrances

20  existing when the petition is filed. 3 Colliers on Bankruptcy ¶ 507.02(2). (15th  ed.

    1979). Administrative expenses or the general costs of reorganization may not

21  generally be charged against secured collateral. *First Western Savings & Loan

22  Association v. Anderson*, 252 F.2, 544, 547 (9th Cir. 1958)." *Central Bank of

    Montana v. Cascade Hydraulics and Utility Service, Inc. (In re Cascade Hydraulics

23  and Utility Service, Inc.)* 815 F.2d 546 (9th Cir. 1987); *Calstar Corporation v.

24  Debbie Reynolds Hotel & Casino, Inc. et al. (In re Debbie Reynolds Hotel &

    Casino, Inc)*, 238 B.R. 831(9th Cir. BAP 1999); *In re Molycorp*, 562 B.R. 67

25  (Bankr.DE 2017). Court will only allow payment of administrative expenses from

26  the proceeds of secured collateral when incurred primarily for the benefit of the

    secured creditor caused or consented to the expense. *First Western Savings & Loan

27  Association v. Anderson*, 252 F.2, 544.

28  Interim attorneys' fees are not final and can be revisited at any time, citing *In re*

clark trevithick

1  that he fully understands the contingent nature of his fees. *See* Jeremiassen Depo. at

2  24:20-25:1 ("Q On the payments made to date, those are interim fee payments;

3  correct? A Correct. Q Are you aware of the possibility of the need to pay those funds

4  back to the extent that they're not finally allowed? A Yes.").

5       Rund's chosen expert has a financial stake in the outcome of this lawsuit – if it

6  fails, he may not be paid the balance owed and may even have to repay what he has

7  received. Jeremiassen's ability to get paid for all of his work in the EPD bankruptcy

8  is contingent on the outcome of this adversary proceeding in which he is testifying as

9  an expert. This effectively makes the expert a partner in the case. That not only

10  violates decades-old ethical rules prohibiting contingent compensation of expert

11  witnesses, but also completely undermines the reliability of the expert's purported

12  opinions and testimony. Multiple authorities in the Ninth Circuit support the

13  conclusion that, since Jeremiassen is a witness with a direct financial interest in the

14  outcome of the lawsuit, he cannot be permitted to testify as an expert witness, as doing

15  so is a an unavoidable conflict of interest and against public policy.

16  **III.**   **The Testimony of Plaintiff's Expert Witness Must Be Excluded, Because**

17       **His Compensation Is Contingent Upon the Outcome of the Case**

18       Relying on the common law and the court's authority to forestall violations of

19  ethical principles, "the majority of courts, including the Courts of this district, have

20  'held that testimony of expert witnesses whose compensation is contingent upon the

21  outcome of the case must be excluded.'" *Gately v. City of Port Hueneme*, No. CV

22  16-4096-GW (JEMx), 2017 WL 8236269, at *13 (C.D. Cal. Oct. 2, 2017), citing

23  *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB (SHx), 2014 WL 10894452,

24  at *4 (C.D. Cal. Oct. 31, 2014), quoting *Straughter v. Raymond*, No. CV 08-2170-

25  CAS (CWx), 2011 WL 1789987, at *2 (C.D. Cal. May 9, 2011).

26  _____

27  *Lochmiller Indus., Inc.*, 178 B.R. 241 (Bankr.S.D. Cal. 1995); *In re Kids Creek Partners, L.P.*, 236 B.R. 871 (Bankr.N.D.Ill. 1999); *In re Rockaway Bedding, Inc.*,

28  454 B.R. 592 (Bankr. NJ 2011).

2408674.1 (18737.001)

NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS
THOMAS P. JEREMIASSEN

clark trevithick

1    Moreover, "[t]he logic of exclusion extends beyond experts retained on a
2    contingency fee basis because permitting the testimony of any expert with a direct
3    financial stake in the outcome of the litigation is against public policy." *Id.* "Once
4    the expert obtains a direct financial interest in the outcome of the litigation (whether
5    by his or her status as a party, by contingency fee agreement, or otherwise), any
6    semblance of independence or promise of intellectual rigor that normally adheres to
7    an expert witness is fatally wounded. Under those rare circumstances, the conflict of
8    interest is so great, and raises so many 'serious questions about the integrity of [the
9    witnesses'] expert testimony,' that to admit the conflicted testimony would violate
10   public policy." *Gately*, 2017 WL 8236269, at *13, citing *Perfect 10, Inc*., 2014 WL
11   10894452, at *4, quoting *Straughter*, 2011 WL 1789987 at *3.

12   More than 80 years ago, the California Court of Appeal held that contingency
13   fee agreements between litigants and expert witnesses are void as against public
14   policy.  See *Straughter*, 2011 WL 1789987 at *2, citing *Von Kesler v. Baker*, 131
15   Cal.App. 654, 658, 21 P.2d 1017 (1933).  In *Von Kesler*, the court reasoned that
16   contingency fee agreements with expert witnesses pose "too great a temptation to
17   practice deceit and to commit the too common crime of perjury." *Id.*  California state
18   and federal courts have adopted and applied *Von Kesler* in subsequent cases.  See,
19   e.g., Van Norden v. Metson, 75 Cal.App.2d 595, 599, 171 P.2d 485 (1946) ("An
20   agreement with a witness to pay him a fee contingent on the success of the litigation
21   it against public policy and void."); *Ouimet v. USAA Casualty Ins. Co*., No. EDCV
22   00–00752–VAP, 2004 WL 5865274, at *2 (C.D. Cal. Jul.14, 2004) (excluding
23   expert's testimony, in part, because it "would run directly afoul of [Rule 5–310 of the
24   California Rules of Professional Conduct]").

25   Although this issue most commonly arises with experts retained on a
26   contingency fee basis, "the underlying logic reaches further … testimony from experts
27   who have a direct financial stake in the outcome of litigation is against public policy."
28   *Perfect 10, Inc*., 2014 WL 10894452, at *4.  While experts may be compensated,

"public policy has long made a distinction between paid experts who have an indirect incentive to win the approval of their employers (the client and attorneys) on the one hand, and experts who have a direct financial stake in the outcome of the litigation on the other.  …  Public policy tolerates the former category of expert testimony as a necessary evil.  …  However, courts of this country draw a line where the expert's incentive structure crosses the threshold from an indirect incentive to reach a certain conclusion to a direct financial interest in doing so." *Id.*  As explained in *Perfect 10, Inc.*:

> Once the expert obtains a direct financial interest in the
> outcome of the litigation (whether by his or her status as a
> party, by contingency fee agreement, or otherwise), any
> semblance of independence or promise of intellectual rigor
> that normally adheres to an expert witness is fatally
> wounded.  Under those rare circumstances, the conflict of
> interest is so great, and raises so many "serious questions
> about the integrity of [the witnesses'] expert testimony,"
> that to admit the conflicted testimony would violate public
> policy.  *Straughter v. Raymond*, 2011 WL 1789987, at *3.

*Perfect 10, Inc.*, 2014 WL 10894452, at *4 (emphasis added).

Here, Plaintiff's designated expert witness, Jeremiassen, has a direct financial interest in the outcome of this adversary proceeding, because the fees that he has been paid by the bankruptcy estate have only been awarded on an interim basis, and are subject to disgorgement if Plaintiff is not successful in defeating the lien of the BC Trust on all assets of the estate.  Jeremiassen is also owed at least another $150,000, which may not be paid at all if Defendants prevail in this case.

Moreover, the $884,758.39 in fees and expenses that Jeremiassen's firm has been paid to date includes not only his expert witness fees in this adversary proceeding, but all of his fees for services to Rund in the entire EPD bankruptcy case.

NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS
THOMAS P. JEREMIASSEN

*See* Jeremiassen Depo. at 22:24-35.  Accordingly, Jeremiassen's conflict of interest is much greater than even a typical contingency fee arrangement, because he stands to lose not only his fees in this case, but also in the entire EPD bankruptcy.  Rund could not have chosen a more conflicted expert.

The prohibition against allowing testimony from an expert witness with an economic interest in the outcome of the litigation has been repeatedly applied in numerous contexts.  Anytime an expert has a financial interest that is in any way contingent on the outcome of the case, his or her testimony must be excluded, because "financial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses." *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 296 (4th Cir. 2002).

If a person with a direct financial interest in the outcome is permitted to testify as an expert, it "may improperly bolster what would otherwise be his lay testimony... thereby causing prejudice and confusing the jury." *Perez v. Seafood Peddler of San Rafael, Inc.*, No. 12-CV-00116-WHO, 2014 WL 2810144, at *2 (N.D. Cal. June 20, 2014) (granting motion to exclude defendant company's general manager from testifying as an expert); see Fed. R. Evid. Rule 403 (even if evidence is relevant, it may be excluded if it would create unfair prejudice, confuse the issues, or mislead the jury).

If Defendants prevail in this case, the BC Trust's secured claim will remain the senior secured claim in this bankruptcy case, and Jeremiassen will lose out on over a million dollars.  In light of this direct conflict of interest, Defendants respectfully submit that Jeremiassen must be precluded from testifying as an expert witness.

## IV.    <u>Conclusion</u>

For the reason stated herein, Defendants' request that the motion be granted.

/ / /

/ / /

1   DATED:  April 30, 2019       CLARK & TREVITHICK

2

3

4                          By:     */s/ Joel A. Goldman*

5                               Joel A. Goldman

6                               Attorneys for Defendants John C. Kirkland, Poshow Ann Kirkland as Trustee of the Bright Conscience Trust dated September 9, 2009

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS THOMAS P. JEREMIASSEN

## <u>DECLARATION OF JOEL A. GOLDMAN</u>

I, Joel A. Goldman, declare as follows:

1.     I am an attorney duly admitted to practice before this Court.  I am Of Counsel to Clark & Trevithick, attorneys of record for Defendants John C. Kirkland, Poshow Ann Kirkland as Trustee of the Bright Conscience Trust dated September 9, 2009.

2.     If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

3.     I make this declaration in support of Defendants' Motion in Limine to Exclude Expert Witness Thomas P. Jeremiassen ("Jeremiassen").

4.     The deposition of expert witness Jeremiassen took place on December 15, 2017.  Attached hereto as <u>Exhibit A</u> are excerpts of Jeremiassen's deposition transcript (pages 22:15-20; 24:20-25:5).

5.     Jeremiassen's expert report was served and filed on September 5, 2017. Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Jeremiassen's expert report.

6.     Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Order entered by the Bankruptcy Court on December 18, 2013 permitting the interim payment of fees and costs (Docket #852 in the main bankruptcy case of 2:10-bk-62208).

7.     Attached hereto as <u>Exhibit D</u> is a true and correct copy of the Ruling entered by the Bankruptcy Court on August 6, 2014, permitting the interim payment of fees and costs (Docket #1051 in the main bankruptcy case of 2:10-bk-62208).

8.     Attached hereto as <u>Exhibit E</u> is a true and correct copy of the Order entered by the Bankruptcy Court on October 6, 2015 permitting the interim payment of fees and costs (Docket #1146 in the main bankruptcy case of 2:10-bk-62208).

9.     On April 23, 2019, the parties met and conferred regarding the subject of this motion. No agreement was reached.

2408674.1 (18737.001)

NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS THOMAS P. JEREMIASSEN

1  I declare under penalty of perjury under the laws of the United States of
2  America that the foregoing is true and correct.

3  Executed on this 30th day of April, 2019, at Los Angeles, California.

4

5  _____/s/ Joel A. Goldman_____

6  Joel A. Goldman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION IN LIMINE OF DEFENDANTS TO EXCLUDE EXPERT WITNESS
THOMAS P. JEREMIASSEN

# EXHIBIT A

**CERTIFIED COPY**

```
 1              UNITED STATES BANKRUPTCY COURT

 2        DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

 3

 4   In re                        )
                                  )
 5   EPD INVESTMENT COMPANY, LLC, )
     and JERROLD S. PRESSMAN,     )
 6                                )
              Debtors,            )
 7   _____  )
                                  )
 8   JASON M. RUND, CHAPTER 7     ) No. 2:10-bk-62208-ER
     TRUSTEE,                     )
 9                                )
              Plaintiff,          )
10                                )
          vs.                     )
11                                )
     JOHN C. KIRKLAND, an individual )
12   and POSHOW ANN KIRKLAND, as  )
     TRUSTEE of the BRIGHT        )
13   CONSCIENCE TRUST DATED       )
     SEPTEMBER 9, 2009,           )
14                                )
              Defendants.         )
15   _____  )

16

17

18          DEPOSITION OF THOMAS P. JEREMIASSEN

19                  December 15, 2017

20

21

22

23

24   Mitch Genser, CSR No. 4239.
     432545
25
```

SINCE 1972

**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco   (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose        (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez        (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn        (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

```
 1              UNITED STATES BANKRUPTCY COURT

 2     DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

 3

 4   In re                         )
                                   )
 5   EPD INVESTMENT COMPANY, LLC,  )
     and JERROLD S. PRESSMAN,      )
 6                                 )
                Debtors,           )
 7   _____)
                                   )
 8   JASON M. RUND, CHAPTER 7      ) No. 2:10-bk-62208-ER
     TRUSTEE,                      )
 9                                 )
                Plaintiff,         )
10                                 )
          vs.                      )
11                                 )
     JOHN C. KIRKLAND, an individual )
12   and POSHOW ANN KIRKLAND, as   )
     TRUSTEE of the BRIGHT         )
13   CONSCIENCE TRUST DATED        )
     SEPTEMBER 9, 2009,            )
14                                 )
                Defendants.        )
15   _____)

16

17

18         DEPOSITION OF THOMAS P. JEREMIASSEN,

19   taken on behalf of Defendants, at 21650 Oxnard

20   Street, Suite 500, Woodland Hills, California 91367,

21   commencing at 9:45 a.m., Friday, December 15, 2017,

22   before Mitch Genser, CSR No. 4239.

23

24

25
```

THOMAS P. JEREMIASSEN
EXHIBIT A

BARKLEY
Court Reporters

Pg. 013

```
 1    PERSONS PRESENT:

 2    For Plaintiff:        BRUTZKUS GUBNER ROZANSKY SEROR
      JASON RUND, CHAPTER  WEBER, LLP
 3    7 TRUSTEE             BY COREY R. WEBER, ESQ.
                           21650 Oxnard Street
 4                         Suite 500
                           Woodland Hills, California 91367
 5                         (818) 827-9000
                           cweber@bg.law
 6
      For Defendants:       LEWIS R. LANDAU, ESQ.
 7                         22287 Mulholland Hwy.
                           Suite 318
 8                         Calabasas, California 91302
                           (888) 822-4340
 9                         lew@landaunet.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    WOODLAND HILLS, CALIFORNIA; FRIDAY, DECEMBER 15, 2017

 2                        9:45 A.M.

 3

 4              (THOMAS P. JEREMIASSEN,

 5         deponent, was sworn and examined

 6            and testified as follows:)

 7

 8              DEPOSITION OFFICER:  Do you solemnly

 9    swear that the testimony that you are about to

10    give in this examination shall be the truth, the

11    whole truth, and nothing but the truth, so help

12    you God?

13              MR. JEREMIASSEN:  I do.

14

15                      EXAMINATION

16    BY MR. LANDAU:

17       Q     Mr. Jeremiassen, good morning.

18       A     Good morning.

19       Q     My name is Lewis Landau.  We introduced

20    ourselves to each other a minute ago.  I've known you

21    for a long time, but I don't think we've met before.

22       A     I think you're right.

23       Q     Pleasure to meet you.

24       A     You, too.

25       Q     Thank you.
```

THOMAS P. JEREMIASSEN
EXHIBIT A

BARKLEY
Court Reporters

Pg. 015

```
 1    can print them out during a break.

 2              I would just note that since the work-in-

 3    process billing that Mr. Jeremiassen provided hasn't

 4    been publically filed, same reservation of rights in

 5    regard to Mr. Jeremiassen and BRG's role as a

 6    consultant, but we've given them to you anyway.

 7    And I'll just assert that objection because they'll

 8    eventually become public record in a forthcoming fee

 9    application anyway.

10              MR. LANDAU:  Sure.

11        Q     I've reviewed your first two fee

12    applications and noted the second one went through

13    July 31st, 2015; correct?

14        A     That sounds right.

15        Q     Do you happen to recall what your billing

16    to date is from and after the second fee app period?

17        A     For the firm, for BRG?

18        Q     Correct.  And when I say "you," I'm

19    referring to the firm.

20        A     I believe it's roughly $150,000.

21              MR. WEBER:  You're referring to the whole

22    bankruptcy case; is that right, Lew?

23              MR. LANDAU:  Is there a section?

24              MR. WEBER:  No, because the billing is for

25    the whole bankruptcy case.
```

THOMAS P. JEREMIASSEN
EXHIBIT A

BARKLEY
Court Reporters

Pg. 016

1            MR. LANDAU:  I mean, that will capture

2    everything, right?

3            MR. WEBER:  Correct.

4            MR. LANDAU:  It wouldn't be something in a

5    different bucket?

6            MR. WEBER:  Correct.

7            MR. LANDAU:  So I looked through them.

8    And just on fees, forgetting about costs, tell me if

9    this is correct.  602,000 on the first app, 279,000

10   on the second fee app, and about 150 between the

11   second fee app and now.

12       Q       Is that ballpark correct?

13           MR. WEBER:  Don't guess.

14           THE DEPONENT:  I don't know.

15           MR. WEBER:  We can print those out as well

16   if you'd like.

17       Q       BY MR. LANDAU:  Is it correct to say that

18   you've accrued over a million dollars in fees for your

19   work on EPD?

20       A       I don't know if it's over.  I don't know.

21   I'd have to look at the applications.  I don't recall.

22       Q       Do you know the unpaid amount due your

23   firm for billing on the EPD cases?

24       A       My recollection is we were paid for the

25   first two interim applications in full, but I could be

                              23

THOMAS P. JEREMIASSEN
        EXHIBIT A                          BARKLEY
                                           Court Reporters
                                           Pg. 017

```
 1   wrong on that.
 2              MR. WEBER:  Lew, you're asking about the
 3   work-in-process billing for which an app hasn't been
 4   filed?
 5              MR. LANDAU:  I'm asking about the gross.
 6   This may be real familiar to you guys, but it's hard
 7   to see it through the filings.  I tried, but I
 8   couldn't find it.
 9              MR. WEBER:  For the record, I think -- and
10   Mr. Jeremiassen can correct me if I'm wrong, but I
11   think that they've been paid in full on the two
12   interim fee applications that have been filed and
13   orders entered, and that the unpaid amount is the
14   work-in-process billing that was produced to you for
15   which another interim fee application hasn't been
16   filed yet.
17              THE DEPONENT:  That's my recollection as
18   well.
19              MR. LANDAU:  Thank you.
20       Q       On the payments made to date, those are
21   interim fee payments; correct?
22       A       Correct.
23       Q       Are you aware of the possibility of the
24   need to pay those funds back to the extent that
25   they're not finally allowed?
```

24

1     A      Yes.

2     Q      Is that your understanding regarding those

3  payments to the extent that the fees are not finally

4  allowed?

5     A      Yes.

6     Q      Back to the documents.

7            No. 13, all budgets that you or your firm

8  prepared in connection with professional services in

9  connection with the case or adversary proceeding.

10           Are there any budgets or proposed budgets?

11    A      No, not that I recall.

12    Q      No. 14, all communications between you or

13 your firm and plaintiff or counsel identifying facts,

14 data or documents that the plaintiff or the counsel

15 provided to you in preparing your report.

16           Have you produced those documents?

17    A      Yes.  I made an attempt to identify all

18 those and produce those to counsel.

19    Q      And what did those consist of?  Are those

20 e-mails?

21    A      Correct.

22    Q      Anything besides e-mails?

23    A      No.

24           MR. LANDAU:  Corey, do I have all those

25 e-mails?

25

# EXHIBIT B

# EPD Investment Co., LLC and

# Jerrold S. Pressman

**Expert Report of Thomas P. Jeremiassen, CPA/CFF, CIRA**

## Table of Contents

|  |  |  | Page |
|---|---|---|---|
| I. | Introduction and Scope | | 1 |
| II. | Qualifications, Experience and Compensation | | 1 |
| III. | Statement of Opinions | | 1 |
| IV. | Background | | 2 |
| V. | Primary Bases and Reasons for Opinions | | 3 |
| | A. | EPD Cash Transaction Analysis | 3 |
| | | 1. Investor Transactions | 4 |
| | | 2. Transactions with Related Entities | 7 |
| | | 3. Jerrold and Keith Pressman Personal Activity | 8 |
| | | 4. Legal and Accounting Fees | 10 |
| | B. | Ponzi Scheme Analysis and Conclusion | 10 |
| | | 1. Reliance on Outside Investor Money | 11 |
| | | 2. Investor Money Was Not Used According to the Stated Purpose | 12 |
| | | 3. New Investor Money Was Used to Pay Returns Promised to Earlier Investors | 13 |
| | | 4. The Business Lacked Profits Sufficient to Provide the Promised Returns, and, therefore, Depended on an Ever Increasing Supply of Investor Money | 14 |
| | C. | Kirkland Transactions | 19 |

### Exhibits

Exhibit 1: Resume for Thomas P. Jeremiassen

Exhibit 2: Schedule of BRG Hourly Rates

Exhibit 3: Listing of Documents and Information Considered and/or Relied Upon

Exhibit 4: Yearly Summaries of EPD Cash Receipts and Disbursements

Exhibit 5: EPD Detailed Cash Receipts and Disbursements Analysis (12/8/03 to 12/7/10)

Exhibit 6: EPD Investor Cash Receipts and Disbursements Summary

i

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

**0004**

EXHIBIT B                                                        **Pg. 022**

Exhibit 7:  EPD Profit & Loss Statement for 2004

Exhibit 8:  EPD Profit & Loss Statement for 2005

Exhibit 9:  EPD Profit & Loss Statement for 2006

Exhibit 10:  EPD Profit & Loss Statement for 2007

Exhibit 11:  EPD Profit & Loss Statement for 2008

Exhibit 12:  EPD Profit & Loss Statement for 2009

Exhibit 13:  EPD Profit & Loss Statement for 2010

Exhibit 14:  EPD Balance Sheet as of 12/31/03

Exhibit 15:  EPD Balance Sheet as of 12/31/04

Exhibit 16:  EPD Balance Sheet as of 12/31/05

Exhibit 17:  EPD Balance Sheet as of 12/31/06

Exhibit 18:  EPD Balance Sheet as of 12/31/07

Exhibit 19:  EPD Balance Sheet as of 12/31/08

Exhibit 20:  EPD Balance Sheet as of 12/31/09

Exhibit 21:  EPD Balance Sheet as of 12/7/10

Exhibit 22:  EPD Federal Income Tax Return for 2004

Exhibit 23:  EPD Federal Income Tax Return for 2005

Exhibit 24:  EPD Federal Income Tax Return for 2006

Exhibit 25:  EPD Federal Income Tax Return for 2007

Exhibit 26:  EPD Federal Income Tax Return for 2008

Exhibit 27:  Jerrold Pressman Amended Federal Tax Return for 2007

Exhibit 28:  SC Club (a/k/a Key Club) Profit & Loss Statement for 2005

Exhibit 29:  SC Club (a/k/a Key Club) Profit & Loss Statement for 2006

Exhibit 30:  SC Club (a/k/a Key Club) Profit & Loss Statement for 2007

Exhibit 31:  SC Club (a/k/a Key Club) Profit & Loss Statement for 2008

Exhibit 32:  SC Club (a/k/a Key Club) Profit & Loss Statement for 2009

Exhibit 33:  SC Club (a/k/a Key Club) Balance Sheet as of 12/31/05

Exhibit 34:  SC Club (a/k/a Key Club) Balance Sheet as of 12/31/06

Exhibit 35:  SC Club (a/k/a Key Club) Balance Sheet as of 12/31/07

Exhibit 36:  SC Club (a/k/a Key Club) Balance Sheet as of 12/31/08

Exhibit 37:  SC Club (a/k/a Key Club) Balance Sheet as of 12/31/09

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0005

EXHIBIT B                                    **Pg. 023**

Exhibit 38:  SC Club Federal Income Tax Return for 2007

Exhibit 39:  SC Club Federal Income Tax Return for 2008

Exhibit 40:  BEM Federal Income Tax Return for 2007

Exhibit 41:  BEM Federal Income Tax Return for 2008

Exhibit 42:  7/8/05 Letter from Kirkland to FTB

Exhibit 43:  Undated Letter from Kirkland to FTB

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0006

EXHIBIT B                                    **Pg. 024**

## I.      Introduction and Scope

Berkeley Research Group, LLC ("BRG") has been retained by Jason M. Rund (the "Trustee"), as Chapter 7 trustee for the consolidated estate of EPD Investment Co., LLC ("EPD" or the "Company") and Jerrold S. Pressman ("Pressman" and collectively with EPD, the "Debtors") to, among other things, review the Debtors' financial information, as well as reconstruct and evaluate the cash receipt and disbursement activity for the period December 2003 to December 2010, for purposes of the identification and pursuit of causes of action. This report was prepared for use in the litigation that was brought by the Trustee.

I have utilized professionals within BRG to assist me in conducting my analyses and preparing this report. This report describes our work to date and summarizes my opinions and bases for those opinions. The opinions and findings expressed herein are based upon our work to date and upon the facts that we observed in our examination and the information currently available. I reserve the right to supplement, update or otherwise modify this report at a later date based on additional information or additional analysis performed.

This report has been prepared solely in connection with the litigation referenced herein and is intended for no other use. We have not performed an audit of any financial statements in accordance with Generally Accepted Auditing Standards, nor have we performed a review or compilation of the financial statements in accordance with the standards promulgated by the American Institute of Certified Public Accountants. Accordingly, I make no representation nor do I express any opinion regarding the accuracy or reasonableness of said information.

## II.     Qualifications, Experience and Compensation

My qualifications and professional experience are detailed in the resume attached as **Exhibit 1**. My current hourly billing rate is $540. **Exhibit 2** lists the hourly rates by level for the professionals and paraprofessionals involved in these matters during BRG's employment by the Trustee. **Exhibit 3** is a list of documents and information that was considered in conducting our analysis and forming the opinions as set forth in this report.

## III.    Statement of Opinions

In accordance with the primary bases and reasons detailed herein, I have thus far formed the following opinions in this case:

1

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

**0007**

**Pg. 025**

- During the period examined, December 2003 to December 2010, EPD was
  operated in a manner indicative of a Ponzi scheme.  Only by virtue of new loans
  from its "investors" was the Company able to sustain itself and its members and
  continue to service the ever increasing debt.

- Approximately $54 million representing obligations on investor loans was paid
  out during the period examined, despite the fact that, during the same period,
  EPD experienced approximately $10.85 million of negative net cash flows from
  activities other than investor receipts and disbursements, and it experienced
  substantial losses in the operation of its business.

- In order to make the substantial obligations on its loans, as well as maintain the
  ability to finance the lifestyles of its members, EPD relied on new loans from its
  investors totaling approximately $64.5 million during the period examined.

- The Debtors' liabilities were substantially greater than the values of the Debtors'
  assets at all times during the period examined.

- During the period October 2008 through December 2009, transfers totaling
  $104,852.82 were made from EPD for the personal benefit of John Kirkland.
  During the period November 2007 through October 2009, transfers totaling
  $1,221,608.23 were made to the Debtors from John Kirkland.[1]

IV.    **Background**

    EPD was formed on June 27, 2003.  Pressman and his son, Keith E. Pressman ("K.
Pressman"), were the members of EPD.[2]  Prior to the formation of EPD, Pressman, as the sole
proprietor, operated an entity called EPD Investment Company since the early 1970's.  Pressman
apparently used EPD to, among other things, fund other businesses, most of which he partially
owned and/or controlled.  EPD was generally funded by obtaining high interest loans from third

---

[1] Included in the transfers to the Debtors is $100,000 received from Keith Pressman, who purportedly had received
that amount from John Kirkland.  $621,608.23 of the transfers received by the Debtors was booked by EPD as a
liability, and $600,000 of the transfers was booked by EPD as revenue.
[2] According to EPD's tax returns through 2008, Jerrold Pressman owned 49% and Keith Pressman owned 51%.
However, EPD's Statement of Financial Affairs filed in connection with the bankruptcy listed Jerrold Pressman
owning 80% of the interest in EPD and Keith Pressman owning 20%.

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0008

EXHIBIT B                                                **Pg. 026**

parties ("Investors").  On December 7, 2010, an involuntary Chapter 7 petition was filed against EPD, and an order for relief was entered on February 9, 2011.  On February 1, 2012, Pressman filed a voluntary Chapter 7 petition.  The EPD and Pressman bankruptcy estates were substantively consolidated pursuant to a court order entered on June 4, 2012.

## V.   Primary Bases and Reasons for Opinions

### A.   EPD Cash Transaction Analysis

We prepared an analysis of all cash receipts and disbursements (the "Cash Analysis") incurred by EPD during the period December 8, 2003 through December 7, 2010 (the "Seven Year Period").  Documents obtained from EPD's bank, City National Bank, were used to prepare the Cash Analysis.  These documents included copies of the bank statements, canceled checks, deposit detail and wire transfer advices.  To help understand the nature or purpose of certain of the transactions, EPD's books and records were utilized.  These included a copy of the Company's historical financial records, which were maintained using the QuickBooks accounting software ("QuickBooks") and copies of available Investor files.

Following is a summary of the cash receipts and disbursements for the Seven Year Period by category:

| Summary of EPD Cash Transactions For the Period December 8, 2003 through December 7, 2010 (Dollars in Thousands) | | | |
|---|---|---|---|
| Category | Receipts | Disbursements | Net |
| Investors | $64,524 | ($53,992) | $10,532 |
| Related Entities | 30,698 | (32,250) | (1,552) |
| Jerrold Pressman | 4,415 | (9,094) | (4,679) |
| Keith Pressman | 4,792 | (7,019) | (2,227) |
| EPD Operations | 88 | (2,596) | (2,508) |
| Legal/Accounting | 0 | (1,017) | (1,017) |
| Other | 2,808 | (1,674) | 1,134 |
| Totals | $107,325 | ($107,642) | ($317) |

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0009

EXHIBIT B                    **Pg. 027**

Attached as **Exhibit 4** are similar summaries broken down by calendar year.  Also, attached as **Exhibit 5**, is a detailed schedule of the cash receipts and disbursements.

### 1.      Investor Transactions

As the above summary illustrates, a majority of the sources of EPD cash was from new loans from Investors.  Similarly, a majority of the uses of EPD cash was payments to Investors or to third parties for the benefit of Investors relating to those new loans as well as loans that were outstanding prior to the Seven Year Period.  According to EPD's QuickBooks, as of December 8, 2003, liabilities to Investors totaling approximately $34.6 million were listed on its balance sheet.  On December 7, 2010, amounts for Investor liabilities totaled approximately $62.3 million; however, we observed that for many payments to Investors that appeared to be interest on Investor notes, EPD reduced the liability accounts rather than booking interest expense.  Therefore, it is unclear at this time what the total principal amount of outstanding Investor loans actually was as of the EPD bankruptcy filing.

As illustrated in the above chart, during the Seven Year Period, approximately $64.5 million was received by EPD from Investors and approximately $54 million was disbursed from EPD to Investors.  Attached as **Exhibit 6** is a summary schedule of the total cash received from, and the total cash disbursed to, each Investor group during the Seven Year Period.  The schedule is grouped by: 1) those Investors who received more cash from EPD than was invested with EPD, or net "winners",[3] and 2) those Investors who invested more cash with EPD than what was returned from EPD, or net "losers".  The schedule illustrates that there were 81 net "winner" Investor groups who received approximately $19.7 million more than what was invested with EPD during the Seven Year Period.  Conversely, there were 78 net "loser" Investor groups who invested approximately $30.2 million more than what was returned by EPD during the Seven Year Period.

Following are examples of EPD's receipt of significant Investor funds at times when the cash balance in its bank account were relatively low, allowing for the ability to "trace" how the proceeds were used:

---

[3] The analysis to determine net "winners" and net "losers" accounts for the cash received from, and disbursed to, Investors during the Seven Year Period, and does not account for interest that purportedly accrued on the Investor loans.

4

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

**0010**

**Investor Cash Tracing Example #1**
**Period: June 9, 2005 to June 16, 2005**

| | |
|---|---|
| Beginning Cash Balance | $75,017 |
| Cash Receipts From: | |
| Investors | 554,140 |
| Other | 40,609 |
| Cash Disbursements To: | |
| Investors | (216,816) |
| FBO Pressmans | (123,283) |
| Other | (127,367) |
| Ending Cash Balance | $202,300 |

**Investor Cash Tracing Example #2**
**Period: March 24, 2006 to April 14, 2006**

| | |
|---|---|
| Beginning Cash Balance | $69,495 |
| Cash Receipts From: | |
| Investors | 1,402,925 |
| Other | 13,672 |
| Cash Disbursements To: | |
| Investors | (530,875) |
| FBO Pressmans | (499,226) |
| Other | (346,775) |
| Ending Cash Balance | $109,216 |

**Investor Cash Tracing Example #3**
**Period: July 3, 2006 to July 14, 2006**

| | |
|---|---|
| Beginning Cash Balance | $300,725 |
| Cash Receipts From: | |
| Investors | 520,229 |
| Other | 2,838 |
| Cash Disbursements To: | |
| Investors | (346,393) |
| FBO Pressmans | (79,718) |
| Other | (345,239) |
| Ending Cash Balance | $52,442 |

**Investor Cash Tracing Example #4**
**Period: October 5, 2006 to October 16, 2006**

| | |
|---|---|
| Beginning Cash Balance | $164,741 |
| Cash Receipts From: | |
| Investors | 595,153 |
| Other | 12,953 |
| Cash Disbursements To: | |
| Investors | (406,184) |
| FBO Pressmans | (35,231) |
| Other | (249,840) |
| Ending Cash Balance | $81,592 |

**Investor Cash Tracing Example #5**
**Period: March 29, 2007 to April 11, 2007**

| | |
|---|---|
| Beginning Cash Balance | $378,540 |
| Cash Receipts From: | |
| Investors | 2,070,260 |
| Other | 23 |
| Cash Disbursements To: | |
| Investors | (586,283) |
| FBO Pressmans | (1,327,526) |
| Other | (324,242) |
| Ending Cash Balance | $210,772 |

**Investor Cash Tracing Example #6**
**Period: June 5, 2007 to June 19, 2007**

| | |
|---|---|
| Beginning Cash Balance | $193,688 |
| Cash Receipts From: | |
| Investors | 1,876,384 |
| Other | 221,743 |
| Cash Disbursements To: | |
| Investors | (378,125) |
| FBO Pressmans | (1,614,984) |
| Other | (107,839) |
| Ending Cash Balance | $190,867 |

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0011

EXHIBIT B                                    **Pg. 029**

| **Investor Cash Tracing Example #7** | |
| :--- | ---: |
| **Period:  April 10, 2009 to April 17, 2009** | |
| Beginning Cash Balance | ($29,971) |
| Cash Receipts From: | |
| Investors | 792,783 |
| Other | 30,162 |
| Cash Disbursements To: | |
| Investors | (294,091) |
| FBO Pressmans | (110,581) |
| Other | (411,166) |
| Ending Cash Balance | ($22,864) |

| **Investor Cash Tracing Example #8** | |
| :--- | ---: |
| **Period:  June 30, 2009 to July 7, 2009** | |
| Beginning Cash Balance | $92,877 |
| Cash Receipts From: | |
| Investors | 291,192 |
| Other | 39,068 |
| Cash Disbursements To: | |
| Investors | (313,076) |
| FBO Pressmans | (26,337) |
| Other | (42,662) |
| Ending Cash Balance | $41,062 |

| **Investor Cash Tracing Example #9** | |
| :--- | ---: |
| **Period:  July 24, 2009 to July 29, 2009** | |
| Beginning Cash Balance | $22,127 |
| Cash Receipts From: | |
| Investors | 101,145 |
| Other | 913 |
| Cash Disbursements To: | |
| Investors | (104,450) |
| FBO Pressmans | (6,269) |
| Other | (11,559) |
| Ending Cash Balance | $1,907 |

| **Investor Cash Tracing Example #10** | |
| :--- | ---: |
| **Period:  February 2, 2010 to February 17, 2010** | |
| Beginning Cash Balance | ($8,602) |
| Cash Receipts From: | |
| Investors | 118,200 |
| Other | 34,957 |
| Cash Disbursements To: | |
| Investors | (44,373) |
| FBO Pressmans | (43,371) |
| Other | (70,204) |
| Ending Cash Balance | ($13,393) |

The above examples illustrate a pattern of EPD's use of Investor loan proceeds to pay obligations to other Investors,[4] as well as for the benefit of its principals, Pressman and K. Pressman.  In total, during the periods illustrated, receipts from Investors totaled approximately $8.3 million, while other receipts during the periods totaled approximately $400,000.  From these proceeds, cash disbursements to Investors totaled approximately $3.2 million and payments made for the benefit of Pressman and K. Pressman totaled approximately $3.9 million.  The source of payments made for the return of loan principal or for interest on the loans of earlier Investors was new loans from other Investors, as opposed to revenue realized from any

---

[4] In each example, the proceeds received from Investors were disbursed to different Investors with the following exceptions:  $46,992 in Example #2, $21,903 in Example #3, $4,500 in Example #4, $24,101 in Example #6, and $46,219 in Example #7 were received and disbursed to the same Investors during the applicable periods.

6

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0012

EXHIBIT B                    **Pg. 030**

legitimate business activities.  This scheme perpetuated a fraud that enabled EPD's principals to benefit from substantial transfers made from EPD's bank accounts.

### 2.      Transactions with Related Entities

During the Seven Year Period, numerous cash transactions between EPD, on one hand, and several different entities ("Related Entities"), on the other hand, took place.  Generally, EPD accounted for these transactions in various asset accounts in QuickBooks under the descriptions "NOTES RECVBLE" and "INVESTMENTS".  It does not appear that EPD was afforded any ownership interest in the entities.  Rather, it appears that Pressman had some sort of interest in and/or control of these entities.  As of the EPD bankruptcy filing, according to QuickBooks, "NOTES RECVBLE" accounts had balances totaling approximately $28.4 million and the "INVESTMENTS" accounts had balances totaling approximately $9.8 million.  According to the schedules filed in connection with its bankruptcy, EPD's assets listed approximately $32.3 million of receivables.  The majority of this amount, or $24,268,000, is listed as owing from Pressman.  The schedules also list $4,413,000 owing from Broadway Entertainment Marketing, Inc. ("BEM") and $4,285,000 owing from S.C. Club, L.P., also known as Key Club ("SC Club"). In the schedules filed in connection with Pressman's bankruptcy, assets with values totaling approximately $27,000 are listed and liabilities totaling nearly $145 million, including $25 million due to EPD, are listed.  The Pressman schedules list his interests in BEM and SC Club as having no values and describing that neither has operated since 2009.

Following is a summary of cash transactions relating to each of the Related Entities:

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0013

EXHIBIT B                          Pg. 031

**Summary of EPD Transactions with Related Entities**
**For the Period December 8, 2003 through December 7, 2010**
**(Dollars in Thousands)**

| Entity | Receipts | Disbursements | Net |
|---|---|---|---|
| BEM | $15,003 | ($12,943) | $2,060 |
| SC Club | 6,354 | (7,043) | (689) |
| JSP Properties | 1,853 | (2,722) | (869) |
| Ice Skating Enterprises | 4,872 | (2,388) | 2,484 |
| Plush Lounge | 70 | (1,477) | (1,407) |
| Fallbrook/Lamsal | 1,718 | (3,251) | (1,533) |
| Broadway Financial Services | 828 | (688) | 140 |
| North Hills | 0 | (1,738) | (1,738) |
| Totals | $30,698 | ($32,250) | ($1,552) |

As the above summary illustrates, more cash was disbursed to the Related Entities, or to other entities for the benefit of the Related Entities, than was received. During the Seven Year Period, a total of approximately 2,700 cash transactions took place with the Related Entities. This equates to an average of more than one transaction per day during that period. It appears that EPD was used as a sort of "cash flow" tool for these entities. At all times during the Seven Year Period, the cumulative amounts disbursed to the entities was greater than the cumulative amounts received from the entities. According to EPD's QuickBooks, the collective amounts owed to EPD from these entities at the end of each year from 2003 to 2010 ranged from approximately $19.8 million to approximately $28.7 million.

### 3. Jerrold and Keith Pressman Personal Activity

During the Seven Year Period, significant payments were made to Pressman and K. Pressman and to third parties for their benefits. Following is a summary of the cash activity for each:

8

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0014

EXHIBIT B                                    **Pg. 032**

**Summary of EPD Cash Transactions Related to Jerrold and Keith Pressman**
**For the Period December 8, 2003 through December 7, 2010**
**(Dollars in Thousands)**

| Disbursement Type | Jerrold Pressman | Keith Pressman | Total |
|---|---|---|---|
| Payments directly to | ($1,587) | ($4,850) | ($6,437) |
| Credit cards | (2,918) | (1,954) | (4,872) |
| Mortgage / other loans | (3,172) | 0 | (3,172) |
| Car | (99) | (100) | (199) |
| Insurance | (135) | (13) | (148) |
| Alimony | (400) | 0 | (400) |
| Taxes | (692) | (14) | (706) |
| Other | (91) | (88) | (179) |
| Totals | ($9,094) | ($7,019) | ($16,113) |
| Receipts by EPD | $4,415 | $4,792 | $9,207 |
| Net Disbursements to | ($4,679) | ($2,227) | ($6,906) |

These payments were made to, or for the benefit of, Pressman and K. Pressman, in spite of the fact that EPD incurred substantial losses and the capital accounts for each were materially negative during the Seven Year Period. Below is a schedule summarizing, by year, during the period 2004 through 2010, the net payments to Pressman and K. Pressman, and, according to the QuickBooks, the losses reported by EPD and the EPD ending equity balances. For the years 2004 through 2010, attached as **Exhibits 7 through 13** are copies of EPD's profit and loss statements, and attached as **Exhibits 14 through 21** are copies of EPD's year-end balance sheets, all of which were generated from EPD's QuickBooks.

9

**Summary of Net Payments to Pressmans**
**For the Period 2004 through 2010**
**(Dollars in Thousands)**

| Year | Net Payments to Pressmans | EPD Losses | EPD Ending Equity |
|------|---------------------------|------------|-------------------|
| 2004 | 1,584 | (3,347) | (3,085) |
| 2005 | 804 | (1,906) | (4,991) |
| 2006 | 1,629 | (5,069) | (10,060) |
| 2007 | 1,207 | (743) | (20,638) |
| 2008 | 805 | (873) | (21,697) |
| 2009 | 754 | (2,505) | (24,202) |
| 2010 | 65 | (629) | (24,831) |
| Totals | 6,848 | (15,072) | |

4.    **Legal and Accounting Fees**

Over $1 million was spent on legal, accounting and other professional fees.  These are separately categorized because it appears that the fees were paid on behalf of EPD, Pressman and various of the Related Entities, but we were not able to segregate the fees by beneficiary.

B.    **Ponzi Scheme Analysis and Conclusion**

EPD's activities reveal the following characteristics, which are indicative of a Ponzi scheme:[5]

- Reliance on outside Investor money;

- Investor money was not used according to the stated purpose;

- New Investor money was used to pay returns promised to earlier Investors; and

- The business lacked profits sufficient to provide the promised returns, and, therefore, depended on an ever increasing supply of investor money.

---

[5] These same characteristics are also outlined in the AICPA Consulting Services Practice Aid 97-1, "Fraud Investigations in Litigation and Dispute Resolution Services" in its description of a Ponzi scheme.

10

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0016

### 1.   Reliance on Outside Investor Money

The Investor notes and loans generally called for interest to accrue at 12% per annum.
The following chart illustrates, for each year from 2004 through 2009, the average outstanding
Investor note principal balances pursuant to EPD's QuickBooks,[6] the estimated interest accrued
on the Investor notes assuming interest accrued at 12% per annum on the outstanding principal
balances, and the net cash received (disbursed) for all non-Investor activities:

| EPD Investor Note Interest Accrual Analysis<br>For the Period 2004 through 2009<br>(Dollars in Thousands) | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
| Investor notes average balance | $39,802 | $45,185 | $48,159 | $55,463 | $60,900 | $61,505 | |
| Estimated interest accrual | 4,776 | 5,422 | 5,779 | 6,656 | 7,308 | 7,381 | $37,322 |
| Non-Investor net cash activity: | | | | | | | |
| Related Entities | (3,437) | (1,551) | 1,218 | (168) | (1,201) | 3,585 | (1,554) |
| Pressman/K. Pressman | (1,584) | (804) | (1,629) | (1,207) | (805) | (754) | (6,783) |
| EPD operations | (304) | (386) | (354) | (375) | (432) | (406) | (2,257) |
| Other | (181) | 643 | (23) | (403) | 197 | (173) | 60 |
| Total non-Investor net cash | ($5,506) | ($2,098) | ($788) | ($2,153) | ($2,241) | $2,252 | ($10,534) |

As the above summary illustrates, substantial amounts for interest on the Investor notes
accrued during the period, but there were not nearly sufficient net cash inflows from non-
Investor activities during the same period.  For the six year period, non-Investor activities
resulted in negative net cash flows of over $10.5 million, and 2009 was the only year during
which there was a positive net cash flow.[7]  Therefore, the only way for EPD to meet its interest
obligations on the notes, as well as its obligations to repay any principal, was to obtain additional
loans from Investors.

---

[6] As noted previously, the outstanding principal balances were likely higher due to the improper recording of interest
payments that reduced the liabilities rather than expensed.
[7] This was due to more funds received from Related Entities than were disbursed to Related Entities during 2009.
However, significant amounts were still owed to EPD from Related Entities as the end of 2009.  According to EPD's
balance sheet as of December 31, 2009, the amounts due from Related Entities totaled over $27 million.

11

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

## 2.    Investor Money Was Not Used According to the Stated Purpose

Many of the Investor liabilities were listed on EPD's financial statements as "LEASE
CONT./3RD PARTY GUARANTEE". Apparently, these Investors were led to believe that their
loans were used to purchase or finance equipment that would then be leased by a third party.
During the Seven Year Period, the Cash Analysis did not reveal the existence of payments to
EPD related to equipment leases, and even the existence of otherwise unencumbered equipment
of any significance at the Related Entities is highly dubious, certainly not to the extent of the
Investor liabilities supposedly tied to leases. According to EPD's QuickBooks, at the beginning
of the period examined, December 8, 2003, total Investor liabilities purportedly associated with
leases totaled approximately $10.8 million. During the Seven Year Period, these liabilities grew
to as much as $18.8 million.

By way of example of these sham equipment leases, we obtained copies of two purported
equipment lease agreements between Huerth Financial Leasing (a company of EPD Investor,
Arthur Huerth) and True Positions Technology ("TPT"), each dated August 8, 2004. The leases
were related to equipment with costs totaling $342,650. Shortly thereafter, on August 23, 2004,
EPD received $400,000 from Mr. Huerth. Subsequently, there are no funds disbursed from EPD
to TPT until March 7, 2008, nearly four years after receipt of the funds from Mr. Huerth.

In addition to the two leases described above, six other purported equipment lease
agreements between Investors and TPT dated between 2000 and 2003 were located. Allen
Sumian, the President of TPT, signed a declaration in which he stated, among other things, that
from 2000 forward, all equipment located at, and used by, TPT was either: (a) owned by TPT; or
(b) leased by TPT directly from the manufacturer of the equipment. Mr. Sumian further
declared, that with respect to each of the eight equipment lease agreements, he was not aware of
any agreement or equipment lease with the Investor, TPT never leased any equipment from the
Investor, and TPT never agreed to pay, nor did it ever make payments to the Investor, or to EPD
for the benefit of the Investor on account of any purported equipment lease. Several of the leases
were signed by K. Pressman as "VP". Mr. Sumian declared that K. Pressman was not a Vice-
President or an officer of TPT when each lease was signed, and K. Pressman never had authority
at any point to enter into contracts or agreements, including but not limited to leases, on behalf of
TPT as of the date of each lease.

12

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

The manner in which EPD accounted for the monthly payments made to Investors related to these supposed equipment leases leads to further skepticism as to the legitimacy of the leases. Generally, the payments were expensed to an account entitled "CONTRACT/LEASE EXPENSE". If these payments were, in fact, made to Investors on behalf of a third party lessee, EPD would simply be an intermediary, and there is no basis for EPD expensing these supposed lease payments. Instead, if the transactions were legitimate, and EPD was advancing the payment on behalf of the third party lessee, EPD would book a receivable due from the lessee. In other words, the transactions would not affect the income statement - only the balance sheet would be affected. Even if an argument could be made that the payments to the Investors should be expensed by EPD, then it should be assumed that any payments from the third party lessees to EPD should, therefore, be booked as income. However, we did not observe any instances of income generated from equipment leases.

### 3.   New Investor Money Was Used to Pay Returns Promised to Earlier Investors

As illustrated in the preceding paragraphs, EPD had no ability to meet its obligations to Investors without the influx of new money from Investors. The following chart illustrates, for the same period, how EPD was able to pay its Investors:

**EPD Investor Payments Analysis**
**For the Period 2004 through 2009**
**(Dollars in Thousands)**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|
| Beginning cash balance | $348 | $178 | $261 | $358 | $204 | $53 | $348 |
| Receipts from Investors | 11,874 | 10,708 | 9,754 | 13,452 | 13,922 | 3,883 | 63,593 |
| Non-Investor net cash activity | (5,506) | (2,098) | (788) | (2,153) | (2,241) | 2,252 | (10,534) |
| Cash available | 6,716 | 8,788 | 9,227 | 11,657 | 11,885 | 6,188 | 53,407 |
| Payments to Investors | (6,538) | (8,527) | (8,869) | (11,453) | (11,832) | (6,187) | (53,406) |
| Ending cash balance | $178 | $261 | $358 | $204 | $53 | $1 | $1 |

Given the manner in which EPD accounted for payments to Investors, it is difficult to break down the Investor payments between interest payments and principal repayments, but what

13

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

is clear from the above analysis is that without the infusion of new Investor money, EPD would not have been able to meet its obligations to its earlier and new Investors.

4.   **The Business Lacked Profits Sufficient to Provide the Promised Returns, and, therefore, Depended on an Ever Increasing Supply of Investor Money**

It is difficult to fathom how EPD could ever be profitable. Its only function appeared to be a funding source for the Related Entities and a means by which to fund the lifestyles of its members, Pressman and K. Pressman. EPD had no interest in the Related Entities; therefore, it had no ability to share in any profits. Rather, it appears that, at best, EPD could just hope to be paid back for its advances made to the Related Entities. It appears that the Related Entities advances and loans were unsecured. The following chart summarizes the results of EPD's operations, as well as the year-end balances of its assets, liabilities and equity, as listed in EPD's QuickBooks:

**EPD Summary of Financial Statements**
**For the Period 2004 through 2009**
**(Dollars in Thousands)**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|
| Income | $1,146 | $4,598 | $2,687 | $3,377 | $3,025 | $624 | $15,457 |
| "Contract/Lease Expense" | (2,713) | (3,377) | (3,584) | (2,089) | (1,587) | (794) | (14,144) |
| Interest Expense | (1,094) | (1,625) | (1,841) | (1,384) | (1,327) | (1,888) | (9,159) |
| Other | (686) | (1,502) | (2,331) | (647) | (984) | (447) | (6,597) |
| Net Profit (Loss) | ($3,347) | ($1,906) | ($5,069) | ($743) | ($873) | ($2,505) | ($14,443) |
| Assets | $44,016 | $43,890 | $43,445 | $26,705 | $28,588 | $27,208 |  |
| Liabilities | (47,101) | (48,882) | (53,505) | (47,343) | (50,285) | (51,410) |  |
| Net Equity | ($3,085) | ($4,992) | ($10,060) | ($20,638) | ($21,697) | ($24,202) |  |

Below is a similar schedule summarizing EPD's federal income tax returns (attached as **Exhibits 22 through 26** are copies of the returns):

14

**Summary of EPD Tax Returns**
**For Years 2004 through 2008**
**(Dollars in Thousands)**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|
| Income | $1,071 | $5,226 | $2,643 | $3,377 | $3,545 | $15,862 |
| Cost of Goods Sold | $0 | ($1,872) | ($765) | $0 | ($587) | (3,224) |
| Deductions | (4,294) | (5,345) | (7,009) | (3,961) | (3,531) | (24,140) |
| Net Income (Loss) | ($3,223) | ($1,991) | ($5,131) | ($584) | ($573) | ($11,502) |
| | | | | | | |
| Assets | $43,630 | $43,817 | $43,402 | $26,678 | $28,573 | |
| Liabilities | (47,282) | (48,869) | (53,394) | (47,165) | (50,095) | |
| Net Equity | ($3,652) | ($5,052) | ($9,992) | ($20,487) | ($21,522) | |

Based on our observations, it appears that the Company overstated its income. Substantially all of the income that it reports during the Seven Year Period is for "CONSULTING AND PROFESSIONAL FEES". It is not clear what services were being provided by EPD that would account for the income generated. Approximately $4.6 million of these fees were attributable to BEM, but most of that amount (approximately $3.7 million) simply resulted in increases to the receivable due from BEM. Many of the other fees appear to be related to Investors, some of which appeared to result from cash received for loans, while others reduced the payable due to the Investors. As for expenses, EPD clearly was not properly accruing interest expense relating to the Investor notes, and that is understated on its financial statements. We have not, at this time, attempted to quantify the misstatements, but even without any adjustments, as illustrated above, the Company was not profitable and did not have the ability to meet its substantial obligations to Investors. The only way it was able to meet those obligations and maintain the illusion that it was a profitable enterprise capable of providing the high returns that it promised to Investors was to borrow additional money. During the Seven Year Period, as illustrated earlier, EPD borrowed approximately $64.5 million from Investors and made payments to Investors totaling approximately $54 million.

As for Pressman, who purportedly guaranteed the Investor notes, we have no evidence that he realized any profits during the Seven Year Period either. Pressman's amended 2007 income tax return, attached as **Exhibit 27**, listed adjusted gross income of negative $12,011,759

15

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

due to over $12.5 million of net operating loss carried forward from the prior year. The 2007 return is the only available return; however, we obtained from the Internal Revenue Service transcripts of Pressman's returns for the years 2003 through 2008. Those transcripts listed Pressman's adjusted gross income as follows: negative $3,741,551 in 2003; negative $7,986,056 for 2004; negative $8,791,588 for 2005; negative $9,930,695 for 2006; and negative $11,577,645 for 2008.

A substantial portion of the assets on EPD's books were notes receivable due from the various Related Entities in which Pressman had an interest. Other than an understanding of the cash activity between the entities and EPD, we are in possession of limited financial information at this time. However, we have certain useful information for BEM and SC Club, the two Related Entities that appeared to be most active during the Seven Year Period. Below is a summary of the results of SC Club, as well as the year-end balances of its assets, liabilities and equity, for the years 2005 through 2009 based upon its own set of QuickBooks. For the years 2005 through 2009, attached as **Exhibits 28 through 32** are copies of SC Club's profit and loss statements, and attached as **Exhibits 33 through 37** are copies of the year-end balance sheets, all of which were generated from SC Club's QuickBooks.

### SC Club Summary of Financial Statements
### For the Period 2005 through 2009
### (Dollars in Thousands)

|  | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|
| Income | $3,866 | $4,334 | $4,603 | $4,483 | $3,329 | $17,286 |
| Cost of Goods Sold | (1,891) | (2,368) | (2,348) | (2,306) | (1,768) | (8,913) |
| Expenses | (3,162) | (3,335) | (3,629) | (3,518) | (1,930) | (13,644) |
| Other Income/Expense | 50 | 750 | 2,115 | 1,703 | 29 | 4,618 |
| Net Profit (Loss) | ($1,137) | ($619) | $741 | $362 | ($340) | ($653) |
| | | | | | | |
| Assets | $6,785 | $6,817 | $6,437 | $6,360 | $6,615 | |
| Liabilities | (18,611) | (19,261) | (18,140) | (17,702) | (18,297) | |
| Net Equity | ($11,826) | ($12,444) | ($11,703) | ($11,342) | ($11,682) | |

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0022

EXHIBIT B                    **Pg. 040**

Also, attached as **Exhibits 38 and 39** are copies of SC Club's 2007 and 2008 federal income tax returns.

We also obtained copies of BEM's federal income tax returns for 2007 and 2008, attached as **Exhibits 40 and 41**. No prior year returns were available; however, the 2007 return includes a summary of prior years' returns. Following is a summary of BEM's returns for the years 2004 through 2008:

**Summary of BEM Tax Returns**
**For Years 2004 through 2008**
**(Dollars in Thousands)**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|
| Income | $2,580 | $0 | $6,085 | $7,635 | $4,950 | $21,250 |
| Cost of Goods Sold | (490) | 0 | (736) | (879) | 0 | (2,105) |
| Deductions | (2,101) | (1) | (6,036) | (6,842) | (6,404) | (21,384) |
| Net Income (Loss) | ($11) | ($1) | ($687) | ($86) | ($1,454) | ($2,239) |
| Assets | N/A | N/A | $373 | $1,064 | $1,106 | |
| Liabilities | N/A | N/A | (1,350) | (2,108) | (3,574) | |
| Net Equity | N/A | N/A | ($977) | ($1,044) | ($2,468) | |

SC Club operated a nightclub in Los Angeles called Key Club. Pressman also had an interest in a nightclub in Las Vegas called Plush Lounge. We have limited information for Plush Lounge; however, we became aware of a litigation involving Plush Lounge against Hotspur Resorts Nevada, LLC. Included in an expert report by Thomas Neches, who was retained by Plush Lounge in connection with the litigation, were summaries of the historical operating results for Plush Lounge. According to the report, Plush Lounge operated from the end of 2003 through the beginning of 2006, during which it incurred losses of approximately $1.5 million.

In addition, the Trustee obtained from Greenberg Traurig letters written by John Kirkland ("Kirkland")[8] to the State of California Franchise Tax Board (the "FTB") on behalf of Pressman related to an offer in compromise of a tax liability arising from the 1992 sale of his company, Stretto Enterprises ("Stretto"). Attached as **Exhibit 42** is a copy of a letter dated July 8, 2005, in

---

[8] Kirkland is an attorney who represented Pressman, EPD and various of the Pressman entities, and was employed at Greenberg Traurig from 2001 through 2006.

17

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0023

which, among other things, Pressman is described as a "retiree, deeply in dept (SIC), with virtually no current income or unencumbered assets." Later in the letter, it asserts that Pressman "has no earnings history. Unfortunately, Mr. Pressman does not have the ability to raise money and generate income." It further describes that "his borrowings over the years through EPD…are now tens of millions of dollars, which are personally guaranteed by Mr. Pressman" and he "does not have the actual or legal ability to" use the proceeds of the Investors to pay for his personal taxes. However, in April 2006, EPD, in fact, did pay Stretto's full principal liability ($456,443) to the FTB using Investor loan proceeds. Between March 23, 2006, when EPD's cash balance in its bank account was approximately $69,495, and April 10, 2006, when the FTB payment was made, EPD received deposits of $1,368,597, of which all but $13,672, or $1,354,925, was received from Investors. However, ten days later, on April 20, 2006, $250,000 is wired into EPD's bank account from RDG Capital Inc. that is credited to Pressman's payable account in QuickBooks. This might have been a loan that Pressman purportedly obtained to partially fund the FTB payment.

In response to the FTB's request for additional information, Kirkland sent another letter to the FTB, a copy of which is attached as **Exhibit 43**. In the undated letter, Kirkland described the financial condition of entities in which Pressman had an interest. For each entity listed, following are excerpts of those descriptions:

- EPD

"The equity interest in EPD is obviously unsaleable (SIC) due to its massive debt load and negative net worth."

- JSP Properties, Inc.

"JSP Properties' assets consist of undeveloped land in Tennessee. The underlying debt is in excess of $9 million, which is more than two times the value of the undeveloped land."

- West Hills Properties, L.P.

"If the company could sell the property today, the money would go to repaying the two major debts and other creditors of the company."

18

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0024

- North Hills Industrial Park, Inc.

"The property is subject to $24,740,000 in mortgages, and has a negative cash flow."
"Mr. Pressman is a 10% shareholder."

- Broadway Entertainment

"It has virtually no assets other than unsaleable (SIC) book value good will, is subject
to approximately $1.1 million in liabilities, and has an approximate $450,000
negative net worth."

- S.C. Club

"It currently carries a negative net worth in excess of $10 million, and to date has a
net loss this year of close to $900,000."

- Ice Skating Enterprises, Inc.

"It has shareholder equity of $31,000, of which over $450,000 consists of good will."

- Ice Group Escondido, Inc.

"It currently has a negative $235,000 shareholder's equity and is operating at a loss
for the year.  It does not own any assets."

The letter further states that "Mr. Pressman's business has generated heavy losses and has
had no income for more than five years.  None of the entities have any saleable (SIC) assets with
equity in excess of secured liens and other debts."

In the schedules filed in connection with his bankruptcy, Pressman assigned values
totaling $25,000 for his stock and interests in businesses.

C.   **Kirkland Transactions**

Following are disbursements from EPD that were paid to Union Bank for the benefit of
Kirkland:

| Date | Amount |
| --- | --- |
| 10/5/2008 | $7,437.50 |
| 11/5/2008 | $7,437.50 |
| 12/5/2008 | $7,437.50 |
| 1/5/2009 | $7,437.50 |

19

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0025

| Date | Amount |
|---|---|
| 2/5/2009 | $7,437.50 |
| 3/5/2009 | $7,809.38 |
| 4/5/2009 | $7,435.52 |
| 5/5/2009 | $7,435.52 |
| 6/5/2009 | $7,435.52 |
| 7/5/2009 | $7,435.52 |
| 8/5/2009 | $7,435.52 |
| 9/5/2009 | $7,435.52 |
| 10/5/2009 | $7,435.52 |
| 12/14/2009 | $7,807.30 |
| Total | $104,852.82 |

According to EPD's QuickBooks, each of the above transactions was booked as a reduction to the liability account associated with Kirkland. Also, for each, the QuickBooks entry and the check referenced "John C. Kirkland" along with a loan account number, evidencing that the payments were on account of a loan that Kirkland had with Union Bank.

The Trustee filed a complaint against Kirkland and Poshow Ann Kirkland, as trustee of the Bright Conscience Trust Dated September 9, 2009 ("Bright Conscience" and, collectively with Kirkland, the "Defendants")[9] seeking, among other things, avoidance and recovery of the above transfers for the benefit of the EPD estate. In the Defendants' initial disclosures made in the action, Bright Conscience alleged that it has a secured claim against the Debtors in the principal amount of $2,055,466.23 plus interest, based on eight transfers made to or for the benefit of the Debtors.

Of the transfers identified by Kirkland, BRG has confirmed that only the following four were received by EPD:

| Date | Amount |
|---|---|
| 11/8/2007 | $150,000.00 |
| 8/18/2008 | $855,466.23 |
| 4/15/2009 | $100,000.00[10] |
| 7/24/2009 | $100,000.00 |
| Total | $1,205,466.23[11] |

---

[9] Kirkland purportedly assigned his interests in EPD to Bright Conscience in or about September 2009.
[10] This payment was received from K. Pressman. A notation in QuickBooks indicates that Kirkland's check was deposited into K. Pressman's account, and EPD deposited a check from K. Pressman.
[11] In addition to these transfers, BRG observed EPD's receipt from Kirkland of a check in the amount of $16,142.00 on October 14, 2009, resulting in total transfers from Kirkland in the amount of $1,221,608.23.

20

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0026

According to EPD's QuickBooks, Kirkland's investment accounts were credited for each of the above transactions, with the exception of the August 18, 2008 transaction. For that transaction, only $255,466.23 was credited to Kirkland's investor account, with the remaining $600,000.00 booked to a revenue account entitled "Consulting & Professional Fees", with the description "Nominee Distribution."

BRG has confirmed that the other four transfers totaling $850,000 were not received by EPD or Pressman. BRG has confirmed that two transfers ($400,000 on September 27, 2007 and $150,000 on March 26, 2008) were received by BEM. A notation on the March 26, 2008 check indicated that the payment was for "Fees." The other two transfers ($200,000 on September 27, 2007 and $100,000 on June 19, 2008) were, according to notations in EPD's records, received by K. Pressman. When these transfers were made, BEM and K. Pressman were debtors of EPD. Kirkland produced a "Continuing Guaranty" agreement, dated as of November 8, 2007, among Kirkland, as lender; EPD, as debtor and guarantor; and Pressman, as guarantor. Among the terms of the agreement is that EPD is obligated to provide Kirkland a "cumulative net return on investment of at least 12% per annum (24% on default)" for all loans made to EPD, as well as all payments for "consulting fees, advisory fees, and professional service fees" to EPD, BEM, K. Pressman, and "any other sister company of EPD."

As for EPD's QuickBooks, Kirkland's investment accounts were not credited for any of the payments that were made to BEM and K. Pressman. The QuickBooks ending balances in Kirkland's investor accounts totaled $570,122.01. Among records produced by EPD's former accountant, Ted Jonavic, were spreadsheets containing statements for each Investor account that, among other things, tracked payments to and from the Investor. Included in one of the spreadsheets were statements for each of Kirkland's investment accounts.[12] These statements included the payments to BEM and K. Pressman; however, underneath the ending balance, there were deductions for those payments, as well as other transactions that appear unrelated to Kirkland. Also, there was a deduction for the $600,000.00 "Nominee Distribution" related to the $855,466.23 payment on August 18, 2008. According to these statements, after accounting for the above-described deductions, the ending principal balances in the Kirkland investment

---

[12] Included in each of the Kirkland investment account statements are notations that read "DO NOT MAIL ANY INFO TO HIM EVER."

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

accounts totaled $572,321.61, a similar amount to the cumulative ending balances contained in
EPD's QuickBooks for the investment accounts.

DATED this 1st day of September 2017.

_____
Thomas P. Jeremiassen, CPA/CFF, CIRA

- PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED -

0028

EXHIBIT B                                                    **Pg. 046**

# EXHIBIT C

1   ROBERT A. HESSLING (State Bar No. 96466)
    *rhessling@gmail.com*
2   MATTHEW F. KENNEDY (State Bar No. 199485)
    *matthewfkenn@gmail.com*
3   ROBERT A. HESSLING, APC
    3853 Meadow Park Lane
4   Torrance, California 90505
    Telephone:   (310) 375-0255
5   Facsimile:   (310) 373-5152

6   Applicant as General Counsel for
    Jason M. Rund, Chapter 7 Trustee

7

FILED & ENTERED

DEC 18 2013

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY gonzalez  DEPUTY CLERK**

8               **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10                   **LOS ANGELES DIVISION**

| | | |
|---|---|---|
| 11 | In re | ) | Case No. 2:10-bk-62208-ER |
| 12 | EPD INVESTMENT COMPANY, LLC and<br>JERROLD S. PRESSMAN, | ) | [Lead Case] |
| 13 | | ) | **ORDER RE:** |
| 14 | Consolidated Debtors. | ) | **(1) FIRST INTERIM APPLICATIONS** |

11  In re                                  )  Case No. 2:10-bk-62208-ER
                                           )  [Lead Case]
12  EPD INVESTMENT COMPANY, LLC and        )
    JERROLD S. PRESSMAN,                   )
13                                         )  **ORDER RE:**
                                           )  **(1) FIRST INTERIM APPLICATIONS**
14              Consolidated Debtors.      )  **FOR AWARDS OF COMPENSATION**
                                           )  **AND REIMBURSEMENTS OF**
15                                         )  **EXPENSES OF ROBERT A. HESSLING,**
                                           )  **APC, AS GENERAL COUNSEL FOR**
16                                         )  **TRUSTEE, EZRA BRUTZKUS GUBNER**
                                           )  **LLP AS SPECIAL LITIGATION**
17                                         )  **COUNSEL FOR TRUSTEE, AND**
                                           )  **BERKELEY RESEARCH GROUP, LLC**
18                                         )  **AS ACCOUNTANTS FOR TRUSTEE;**
                                           )  **AND (2) FIRST AND FINAL**
19                                         )  **APPLICATION FOR AWARD OF**
                                           )  **COMPENSATION AND**
20                                         )  **REIMBURSEMENT OF EXPENSES OF**
                                           )  **DANNING, GILL, DIAMOND &**
21                                         )  **KOLLITZ, LLP AS FORMER**
                                           )  **GENERAL COUNSEL FOR TRUSTEE**
22                                         )
                                           )  Date:    December 4, 2013
23                                         )  Time:    10:00 a.m.
                                           )  Ctrm.:   Courtroom "1568"
24  _____       )           255 E. Temple St.
                                           )           Los Angeles, CA

25        The First and Final Application for Award of Compensation and Reimbursement of

26  Expenses of Danning, Gill, Diamond & Kollitz, LLP as Former General Counsel for Chapter 7

27  Trustee ("Final Fee Application") (Docket, No. 375, filed 12/3/12) filed by Danning, Gill,

28  Diamond & Kollitz, LLP ("DGDK") and the following interim fee applications (collectively, the

                                        1

EXHIBIT C                                    **Pg. 048**

1   "First Interim Fee Applications") – (1) the First Interim Application for Award of Compensation

2   and Reimbursement of Expenses of Robert A. Hessling, APC, as General Counsel for Trustee

3   (Docket, No. 791, filed 11/13/13) filed by Robert A. Hessling, APC ("RAH, APC"); (2) the First

4   Interim Application for Award of Compensation and Reimbursement of Expenses of Ezra Brutkus

5   Gubner LLP as Special Litigation Counsel for Jason M. Rund, Chapter 7 Trustee (Docket, No. 793,

6   11/13/13), filed by Ezra Brutzkus Gubner LLP ("EBG"); and (3) the First Interim Application of

7   Berkeley Research Group, LLC for Allowance and Payment of Fees and Expenses Incurred as

8   Accountants and Financial Advisors for the Chapter 7 Trustee for the Period April 10, 2012

9   through October 31, 2013 (Docket, No. 789, filed 11/13/13) filed by Berkeley Research Group,

10  LLC ("BRG") – came on regularly for hearing on the above date and time and at the above place

11  before the Honorable Ernest M. Robles, United States Bankruptcy Judge.  Appearances were as

12  noted in the record.

13          The Court considered the pleadings filed in support of and in opposition to the Final Fee

14  Application and the First Interim Fee Applications.  It appearing that good cause exists,

15          IT IS ORDERED that:

16          1.      The First Interim Fee Applications of RAH, APC, EBG and BRG are granted.

17          2.      The Final Fee Application of DGDK is granted in part, and the balance of its

18  requested fees in the sum of $140,338.47 is deferred for hearing at a later date.

19          3.      RAH, APC is allowed fees of $150,272.50 and expenses of $882.56 as Chapter 7

20  administrative expenses on an interim basis for the period from June 27, 2012 through October 31,

21  2013.

22          4.      The Trustee is authorized to pay RAH, APC $50,040.74 (*i.e.*, 33.3%) of the allowed

23  interim fees and $882.56 (*i.e.*, 100%) of the allowed interim expenses forthwith.

24          5.      EBG is allowed fees of $2,423,094.00 and expenses of $135,387.64 as Chapter 7

25  administrative expenses on an interim basis for the period from February 11, 2011 through

26  September 30, 2013.

27          6.      The Trustee is authorized to pay EBG $806,890.30 (*i.e.*, 33.3%) of the allowed

28  interim fees and $135,387.64 (*i.e.*, 100%) of the allowed interim expenses forthwith.

2

EXHIBIT C                                                    **Pg. 049**

1        7.      BRG is allowed fees of $602,680.90 and expenses of $354.87 as Chapter 7

2    administrative expenses on an interim basis for the period from April 10, 2012 through October 31,

3    2013.

4        8.      The Trustee is authorized to pay BRG $200,692.74 (*i.e.*, 33.3%) of the allowed

5    interim fees and $354.87 (*i.e.*, 100%) of the allowed interim expenses forthwith.

6        9.      DGDK is allowed fees of $70,064.03 and expenses of $4,229.72 as Chapter 7

7    administrative expenses on a final basis for the period from February 7, 2011 through June 26,

8    2013, and the balance of the requested fees in the sum of $140,338.47 is deferred for hearing at a

9    later date.

10        10.     The Trustee is authorized to pay DGDK $70,064.03 (*i.e.*, 100%) of the allowed final

11    fees and $4,229.72 (100%) of the allowed final expenses forthwith.

12                              ###

24    Date: December 18, 2013

Ernest M. Robles
United States Bankruptcy Judge

3

EXHIBIT C                    Pg. 050

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): **ORDER RE: (1)  FIRST INTERIM APPLICATIONS FOR AWARDS OF COMPENSATION AND REIMBURSEMENTS OF EXPENSES OF ROBERT A. HESSLING, APC, AS GENERAL COUNSEL FOR TRUSTEE, EZRA BRUTZKUS GUBNER LLP AS SPECIAL LITIGATION COUNSEL FOR TRUSTEE, AND BERKELEY RESEARCH GROUP, LLC AS ACCOUNTANTS FOR TRUSTEE; AND (2) FIRST AND FINAL APPLICATION FOR AWARD OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF DANNING, GILL, DIAMOND & KOLLITZ, LLP AS FORMER GENERAL COUNSEL FOR TRUSTEE** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of December 5, 2013, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

☒  Service information continued on attached page

**2. SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

☒  Service information continued on attached page

**3. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐  Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9021-1.1.NOTICE.ENTERED.ORDER**

EXHIBIT C

**Pg. 051**

**ADDITIONAL SERVICE INFORMATION (IF NEEDED):**

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

Ronald P Abrams     rabrams@ebg-law.com;ecf@ebg-law.com, ecf@ebg-law.com
Ronald P Abrams     rabrams@ebg-law.com, ecf@ebg-law.com
Ronald P Abrams     rabrams@ebg-law.com, ecf@ebg-law.com
Michael W Aiken     MAiken@NBSDefaultServices.com
Justin D Balser     justin.balser@akerman.com,
toni.domres@akerman.com;kristine.elliott@akerman.com;victoria.edwards@akerman.com;elizabeth.streible@akerma
n.com;courtney.linney@akerman.com;brooke.nicholson@akerman.com
Adam N Barasch     anb@severson.com
Colin M Bernardino     cbernardino@kilpatricktownsend.com
Craig R Bockman     crbockman@jonesbell.com, yleandro@jonesbell.com
Craig R Bockman     crbockman@jonesbell.com, yleandro@jonesbell.com
Rebecca A Caley     rcaley@caleylaw.com, kana@caleylaw.com;carolyn@caleylaw.com
Michael E Clark     notices@blclaw.com, ecf@blclaw.com;borowitzclark1@gmail.com
Michael E Clark     notices@blclaw.com, ecf@blclaw.com;borowitzclark1@gmail.com
Leslie A Cohen     leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;Brian@lesliecohenlaw.com
Sara E Cook     lpalma@mckenna-law.com, scook@mckenna-law.com;bankruptcy@mckenna-law.com
Christopher D Crowell     ccrowell@frandzel.com, efiling@frandzel.com;shom@frandzel.com
Ana Damonte     ana.damonte@pillsburylaw.com
Michael W Davis     mdavis@ebg-law.com, ecf@ebg-law.com
Michael W Davis     mdavis@ebg-law.com, ecf@ebg-law.com
Aaron De Leest     aed@dgdk.com, DanningGill@gmail.com
**Trustee's Former General Counsel** Richard K Diamond     rdiamond@dgdk.com, DanningGill@gmail.com
Claire Y Dossier     claire.dossier@akerman.com,
toni.domres@akerman.com;amy.rock@akerman.com;melissa.cizmorris@akerman.com;lisa.blaylock@akerman.com;
courtney.linney@akerman.com
David K Eldan     malvarado@pmcos.com, rpinal@pmcos.com;efilings@pmcos.com
David K Eldan     malvarado@pmcos.com, rpinal@pmcos.com;efilings@pmcos.com
Russ W Ercolani     ercolaniecfmail@gmail.com
Debra Fogelman     DEBRAFOGELMAN@LIVE.COM
Anthony A Friedman     aaf@lnbyb.com
Larry W Gabriel     lgabriel@ebg-law.com, nfields@ebg-law.com
Daniel H Gill     ecf@ebg-law.com, dgill@ebg-law.com
Jeffrey I Golden     jgolden@wgllp.com, kadele@wgllp.com
Michael J Gomez     mjg@lrplaw.net, jdrudge@lrplaw.net
Michelle S Grimberg     msg@lnbrb.com, angela@lnbrb.com
**Trustee's Special Litigation Counsel** Steven T Gubner     sgubner@ebg-law.com, ecf@ebg-law.com
Regis Guerin     efilings@amlegalgroup.com
Alan S Gutman     alangutman@gutmanlaw.com
David S Hagen     go4broq@earthlink.net
**Trustee's General Counsel** Robert A Hessling     rhessling@gmail.com
Robert A Hessling     rhessling@gmail.com
Richard B Hopkins     rhopkins@bargerwolen.com, gvalles@bargerwolen.com
Lon B Isaacson - DISBARRED -     ecfnotices@lbilaw.com
John P Jacobs     jpjacobs@steptoe.com, tsosa@steptoe.com;sramme@steptoe.com
James N Knight     james@jnk-law.com
Michael S Kogan     mkogan@koganlawfirm.com
Alan R Kossoff     akossoff@kwikalaw.com, bdipalma@kwikalaw.com
John P Kreis     jkreis@kreislaw.com, j.kreis@ca.rr.com
David B Lally     davidlallylaw@gmail.com
Lewis R Landau     LLandau@HorganRosen.com
Ian Landsberg     ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;ssaad@landsberg-
law.com;dzuniga@landsberg-law.com
Ian Landsberg     ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;ssaad@landsberg-
law.com;dzuniga@landsberg-law.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                       **F 9021-1.1.NOTICE.ENTERED.ORDER**
EXHIBIT C                                                  **Pg. 052**

Mary D Lane    mal@msk.com, mec@msk.com
Ann G Lee    alee@grahamvaagelaw.com
Jennifer Leland    jleland@peitzmanweg.com
Kenderton S Lynch    kenlynchlaw@aol.com
Howard N Madris    hmadris@madrislaw.com
Aaron J Malo    amalo@sheppardmullin.com, ssheppard@sheppardmullin.com
Ashley M McDow    amcdow@bakerlaw.com, rojeda@bakerlaw.com;gharris@bakerlaw.com
Neeta Menon    nmenon@btlaw.com
Reed M Mercado    rmercado@sheppardmullin.com
Stacey A Miller    smiller@tharpe-howell.com
John A Moe    jmoe@mckennalong.com
Susan I Montgomery    susan@simontgomerylaw.com
Randall P Mroczynski    randym@cookseylaw.com
Alan I Nahmias    anahmias@mbnlawyers.com, jdale@mirmanbubman.com
David L. Neale    dln@lnbrb.com
David L. Neale    dln@lnbrb.com
Warren N Nemiroff    wnemiroff@yahoo.com
Brian A Paino    ecfcacb@piteduncan.com
Kathy Bazoian Phelps    kphelps@diamondmccarthy.com, mshabpareh@diamondmccarthy.com
Jason S Pomerantz    jspomerantz@pszjlaw.com, jspomerantz@pszjlaw.com
Christopher O Rivas    crivas@reedsmith.com
**Trustee**  Jason M Rund (TR)    trustee@srlawyers.com, jrund@ecf.epiqsystems.com
Deborah L Schrier-Rape    dsr@dsr-law.com
Benjamin Seigel    bseigel@buchalter.com, IFS_filing@buchalter.com;smartin@buchalter.com
Steven J Shapero    sshapero@shaperohurst.com
David B Shemano    dshemano@peitzmanweg.com
Autumn D Spaeth    aspaeth@wgllp.com, tjones@wgllp.com
Daniel B Spitzer    dspitzer@spitzeresq.com
Michael St James    ecf@stjames-law.com
Alberta P Stahl (TR)    trusteestahl@earthlink.net,
astahl@ecf.epiqsystems.com;trusteestahl\;\;\;.net@cacbapp.cacb.circ9.dcn
Adam M Starr    starra@gtlaw.com, laik@gtlaw.com
Tina M Starr    tstarr@caleylaw.com
David A Tilem    davidtilem@tilemlaw.com,
malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;joanfidelson@tilemlaw.com
Scott C Timpe    stimpe@mbnlawyers.com, scott.timpe@gmail.com;aacosta@mbnlawyers.com
John C Torjesen    Torjesen@LAinjurylaw.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Susan L Vaage    svaage@grahamvaagelaw.com
**Trustee's Special Litigation Counsel**  Corey R Weber    ecf@ebg-law.com, cweber@ebg-law.com
Corey R Weber    ecf@ebg-law.com, cweber@ebg-law.com
Gilbert B Weisman    notices@becket-lee.com
Robert G Wilson    rwilson@lgbfirm.com, kalandy@lgbfirm.com
Aleksandra Zimonjic    azimonjic@lgbfirm.com, marizaga@lgbfirm.com;ncereseto@lgbfirm.comRonald P Abrams
rabrams@ebg-law.com, ecf@ebg-law.com

2. <u>**SERVED BY U.S. MAIL**</u>

<u>Debtor</u>
EPD Investment Co., LLC
601 S. Figueroa St., Ste 3900
Los Angeles, CA 90017

<u>Consolidated Debtor</u>
Jerrold S. Pressman
16030 Ventura Blvd., Suite 470
Encino, CA 91436

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                     **F 9021-1.1.NOTICE.ENTERED.ORDER**
                                    EXHIBIT C                            **Pg. 053**

# EXHIBIT D

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

Wednesday, August 06, 2014                          **Hearing Room     1568**

11:00 AM
**2:10-62208     EPD Investment Co., LLC**                          **Chapter 7**

#100.00     HearingRE: [1045] Motion Motion Of Trustee For Order Authorizing Trustee To Pay
Unpaid Prior Allowed Interim Fees Of: (1) Robert A. Hessling, APC As General Counsel
For Trustee; (2) Ezra Brutzkus Gubner LLP As Special Litigation Counsel For Trustee;
And (3) Berkeley Research Group, LLC As Accountants For Trustee; Memorandum Of
Points And Authorities; Declaration Of Jason M. Rund; And Request For Judicial
Notice, with Proof Of Service  (Hessling, Robert)

Docket     1,045

**Matter Notes:**

8/6/2014

The tentative ruling will be the order.
**POST PDF OF TENTATIVE RULING TO CIAO**

**Tentative Ruling:**

8/5/2014:  For the reasons set forth below, GRANT Motion.

**Pleadings filed and reviewed:**
1. Motion of Trustee for Order Authorizing Trustee to Pay Unpaid Prior Allowed
   Interim Fees of (1) Robert A. Hessling, APC as General Counsel for Trustee; (2)
   Ezra Brutzkus Gubner LLP as Special Litigation Counsel for Trustee; and (3)
   Berkeley Research Group, LLC as Accountants for Trustee; Memorandum of
   Points and Authorities; Declaration of Jason M. Rund; and Request for Judicial
   Notice (D.E. 1045) ("Motion")
2. Notice of Motion (D.E. 1047)
3. Objection of Poshow Ann Kirkland, Individually and as Trustee of the Bright
   Conscience Trust (D.E. 1048) ("Opposition")
4. Trustee's Reply to Opposition; Request for Judicial Notice (D.E. 1050) ("Reply")

### United States Bankruptcy Court
### Central District of California
#### Los Angeles
#### Judge Ernest Robles, Presiding
#### Courtroom 1568 Calendar

**Wednesday, August 06, 2014**                    **Hearing Room    1568**

11:00 AM

**CONT...    EPD Investment Co., LLC**                     Chapter 7
**Facts and Summary of Pleadings:**

Jason Rund, Chapter 7 Trustee ("Trustee") of the consolidated estates
("Estate") of EPD Investment Company, LLC ("EPD") and Jerrold S. Pressman
("Pressman") (collectively, the "Debtors"), herein seeks an order authorizing the
Trustee to pay unpaid prior allowed interim fees in the total sum of $2,118,423.62 to
Robert A. Hessling, APC ("RAH, APC") as the Trustee's general counsel, Ezra
Brutzkus Gubner LLP ("EBG") as the Trustee's special litigation counsel, and
Berkeley Research Group, LLC ("BRG") as the Trustee's accountants (collectively,
the "Trustee's Professionals").  Motion at 3.

On November 13, 2013, the Trustee's Professionals filed First Interim Fee
Applications seeking approval of interim fees and costs and payment of 33.3% of the
approved fees due to the Estate's inability to pay the interim fees in full at the time.
Motion at 3. (D.E. 789, 791, 793.)  BCT and Poshow Ann Kirkland, individually and
as BCT's trustee (hereinafter, "Ms. Kirkland") filed limited objections to the
applications, contending, among other things, that BCT holds a first priority lien
affecting the recoveries obtained by the Trustee regarding claims and causes of action
to avoid and recover fraudulent transfers.  Motion at 7.  The Trustee disputed and
continues to dispute BCT's purported secured claim and lien.  Id.  By order entered
on December 18, 2013, the Court granted the First Interim Fee Applications and
authorized the Trustee to pay 33.3% of the Trustee's Professionals' allowed fees and
100% of their allowed expenses.  Id. at 9.  The Trustee thereafter made such
payments, leaving an unpaid balance in the amount of $2,118,423.62.  Id.

BCT and Ms. Kirkland filed notices of appeals regarding the Interim Fee
Order, and filed a motion for leave to file the interlocutory appeals.  Motion at 9.  The
motion and appeals are pending.  Id.  However, there is no stay of the Interim Fee
Order.  Id.

The Trustee states that as of June 9, 2014, the Estate had cash-on-hand of
about $5,414,000 and total receipts of about $7,036,000.  Motion at 6.  The Trustee
asserts that, if the payments are approved and made, the Estate will still have
approximately $3,295.00 in funds left on hand.  Id. at 3.  Further, the Trustee expects
to recover additional monies from the prosecution and potential settlements of the
Trustee's claims and causes of action for the avoidance and recovery of fraudulent
transfers.  Id.

### United States Bankruptcy Court
### Central District of California
#### Los Angeles
#### Judge Ernest Robles, Presiding
#### Courtroom 1568 Calendar

---

**Wednesday, August 06, 2014**                                        **Hearing Room     1568**

---

11:00 AM
CONT...       **EPD Investment Co., LLC**                              Chapter 7

Based on the foregoing, the Trustee asserts that payment of the prior approved, but unpaid, fees is appropriate because such payments are reasonable and proper pursuant to §§ 330(a)(1) and 105(a). Motion at 10-11. The Trustee contends that, notwithstanding BCT and Ms. Kirkland's pending appeals, the Estate would still have sufficient funds remaining after payment of the fees to pay BCT's purported lien in full if the Trustee is ultimately unsuccessful in avoiding the purported lien in the pending adversary proceeding. Id. at 11.

In support of the Motion, the Trustee filed a Declaration of Jason M. Rund. Motion at 13. The Trustee also requests that the Court take judicial notice of several documents and pleadings, set forth on pages 17-22. The Court denies the Trustee's request to take judicial notice of Exhibits 1 and 2 on the basis that these documents are not attached to the Motion. See In re Tyrone F. Conner Corp., Inc., 140 B.R. 771, 781 (Bankr. E.D. Cal. 1992) (Party requesting judicial notice must supply the court with the source material needed to determine whether the request is justified.) The Court grants the Trustee's request for judicial notice of the existence of the pleadings filed in the Pressman case before consolidation, the EPD case before consolidation, the consolidated case of EPD and Pressman, and in the Rund v. Bright Conscience Trust (Adv. No. 2:12-ap-02424-ER). See U.S. v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases.")

On July 23, 2014, Ms. Kirkland filed a timely Opposition raising nearly identical objections to those made in Ms. Kirkland's Opposition to the Interim Fee Applications. Accordingly, Ms. Kirkland again requests that the Court deny the relief requested, or condition payment of the unpaid fees upon an adequate protection provision with respect to Ms. Kirkland's and the Trust's interests.

On July 28, 2014, the Trustee filed a timely Reply asserting that BCT [and Ms. Kirkland] are again attempting to re-litigate the lien issues in the context of the instant Motion, notwithstanding the Court's prior Tentative Ruling on the Fee Applications in which the Court declined to decide the issues relating to BCT's alleged lien outside of the Trustee's pending adversary proceeding against BCT. Reply at 3-4. The Trustee reiterates that after paying the respective unpaid fees, the Estate will still have $3,295,000 on hand to pay BCT's claims if BCT prevails in the adversary proceeding.

---

### United States Bankruptcy Court
### Central District of California
#### Los Angeles
#### Judge Ernest Robles, Presiding
#### Courtroom 1568 Calendar

Wednesday, August 06, 2014                                    **Hearing Room   1568**

11:00 AM

CONT...        **EPD Investment Co., LLC**                          **Chapter 7**

Id. at 2 and 4.  The Trustee also acknowledges that the prior allowed interim fees are
still subject to final approval.  Id. at 4.

#### The Court finds and concludes as follows:

Section 331 of the Bankruptcy Code expressly authorizes both interim fee
applications and interim payments to attorneys for chapter 7 trustees.  In re
Commercial Consortium of California, 135 B.R. 120, 125 (Bankr. C.D. Cal. 1991).
The essential purpose of this section is to relieve counsel and other professionals of
the burden of "financing" lengthy bankruptcy proceedings.  Id. at 123 (citing In re
Evangeline Refining Co., 890 F.2d 1312 (5th Cir. 1989); In re Mansfield Tire &
Rubber Co, 19 B.R. 125, 127 (Bankr. N.D. Ohio 1981)).

The appropriateness of the allowance and payment of fees on an interim basis
in any particular case will depend on several factors: (1) the current availability of
funds from which fees can be disbursed; (2) the existences and amount of other
accrued administrative obligations of the same or higher priority that might exhaust
available funds; (3) the continuing need for funds to pay the necessary administrative
expenses likely to be incurred in completing the administration of the case; and (4)
inability to file a final fee application in the near future.  In re Commercial
Consortium of California, 135 B.R. at 124-25.

Here, the Court finds it appropriate to authorize the Trustee to pay the
remaining approved, but unpaid interim fees.  Per the Trustee's Declaration, there are
ample estate funds to pay the fees while preserving adequate funds to pay BCT's
interest in full, should the Trustee prove unsuccessful in avoiding BCT's purported
lien.  The Trustee also asserts that the Trustee's Professionals will assist the Trustee in
bringing additional funds into the Estate and that much work remains to be done
before the Estate is fully administered.  The Court also notes that Ms. Kirkland's
objection is limited to the source of funds that will be used to pay the requested
disbursements, and not to the reasonableness of the amounts awarded in the Interim
Fee Applications.

Therefore, the Court overrules Ms. Kirkland's objection at this time.  The
Court declines to decide the issues raised in the Opposition within the context of the
instant Motion.  As the Court noted in its prior Tentative Ruling approving the Interim
Fee Applications, the respective fees are subject to final approval and possible

### United States Bankruptcy Court
### Central District of California
#### Los Angeles
#### Judge Ernest Robles, Presiding
#### Courtroom 1568 Calendar

Wednesday, August 06, 2014                                   **Hearing Room**   1568

11:00 AM
CONT...        **EPD Investment Co., LLC**                                   Chapter 7

disgorgement.  The interim fee award status has not changed.  Accordingly, the
Trustee is authorized to use Estate funds to make the requested disbursements.
However, in light of the unresolved appeals and pending litigation, the Court will not
be lightly persuaded by equitable arguments from the Professionals in the face of
possible disgorgement.

    For the reasons stated above, the Court GRANTS the Motion and authorizes
the Trustee to pay the Trustee's Professionals their respective unpaid fees in the total
amount of $2,118,423.62, subject to final approval and possible disgorgement.

    The Trustee shall lodge a conforming proposed order within 7 days of the
hearing.

No appearance is required if submitting on the court's tentative ruling.  If submitting
on the tentative, please contact Daniel Koontz or Jessica Vogel, the Judge's law clerks
at 213-894-1522.  Should an opposing party file a late opposition or appear at the
hearing, the court will determine whether further hearing is required.  If you wish to
make a telephonic appearance, contact Court Call at 888-882-6878, ext. 188 no later
than one hour before the hearing.

| Party Information |
|---|

**Debtor(s):**

  EPD Investment Co., LLC                          Pro Se

**Movant(s):**

  Jason M Rund (TR)                                Represented By
                                                Corey R Weber
                                                Robert A Hessling
                                                  Richard K Diamond
                                                Daniel H Gill
                                                Michael W Davis
                                                  Steven T Gubner
                                                Ronald P Abrams

EXHIBIT D                          **Pg. 059**

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

**Wednesday, August 06, 2014**                                   **Hearing Room    1568**

11:00 AM
**CONT...      EPD Investment Co., LLC**                                   **Chapter 7**

**Trustee(s):**

Jason M Rund (TR)                              Represented By
                                               Corey R Weber
                                               Robert A Hessling
                                               Richard K Diamond
                                               Daniel H Gill
                                               Michael W Davis
                                               Steven T Gubner
                                               Ronald P Abrams

EXHIBIT D                                          **Pg. 060**

# EXHIBIT E



1  STEVEN T. GUBNER – Bar No. 156593
   COREY R. WEBER – Bar No. 205912
2  EZRA BRUTZKUS GUBNER LLP
   21650 Oxnard Street, Suite 500
3  Woodland Hills, CA  91367
   Telephone:  (818) 827-9000
4  Facsimile:   (818) 827-9099
   Email: sgubner@ebg-law.com
5          cweber@ebg-law.com

6  Applicant as Special Litigation Counsel for
   Jason M. Rund, Chapter 7 Trustee

7

**FILED & ENTERED**

**OCT 06 2015**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

**CHANGES MADE BY COURT**

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

11 In re                                    )   Case No. 2:10-bk-62208-ER
                                            )   [Lead Case]
12 EPD INVESTMENT COMPANY, LLC AND          )
   JERROLD S. PRESSMAN,                     )   Chapter 7
13                                          )
                                            )   **ORDER APPROVING SECOND**
14            Consolidated Debtors.         )   **INTERIM APPLICATIONS FOR**
                                            )   **AWARDS OF COMPENSATION AND**
15                                          )   **REIMBURSEMENT OF EXPENSES OF**
                                            )   **EZRA BRUTZKUS GUBNER LLP AS**
16                                          )   **SPECIAL LITIGATION COUNSEL FOR**
                                            )   **JASON M. RUND, CHAPTER 7**
17                                          )   **TRUSTEE AND BERKELEY**
                                            )   **RESEARCH GROUP LLC AS**
18                                          )   **ACCOUNTANTS FOR THE TRUSTEE,**
                                            )   **MOTION FOR ALOWANCE AND**
19                                          )   **PAYMENT OF UNPAID FINAL FEES**
                                            )   **OF DANNING GILL DIAMOND &**
20                                          )   **KOLLITZ LLP, FORMER ATTORNEYS**
                                            )   **FOR CHAPTER 7 TRUSTEE, AND**
21                                          )   **FINAL APPLICATION FOR AWARD**
                                            )   **OF COMPENSATION AND**
22                                          )   **REIMBURSEMENT OF EXPENSES OF**
                                            )   **DANNING GILL DIAMOND &**
23                                          )   **KOLLITZ LLP**
                                            )
24                                          )   Hearing:
                                            )   Date:  October 6, 2015
25                                          )   Time:  10:00 a.m.
                                            )   Place: Courtroom 1568
26                                          )          United States Bankruptcy Court
                                            )          255 E. Temple Street
27 _____ )          Los Angeles, CA 90012

28

                              1

1409864

EXHIBIT E                                           **Pg. 062**

1         The Second Interim Applications of Ezra Brutzkus Gubner LLP ("EBG") as Special

2    Litigation Counsel for the Trustee (Docket No. 1133, filed on September 15, 2015) and Berkeley

3    Research Group LLC ("BRG") as Accountants for the Trustee (Docket No. 1131, filed on

4    September 15, 2015) (collectively, the "Second Interim Fee Applications"), the Motion for

5    Allowance and Payment of Unpaid Final Fees (the "Motion for Unpaid Final Fees") of Danning

6    Gill Diamond & Kollitz LLP ("DGDK"), Former Attorneys for the Trustee (Docket No. 1126,

7    filed on August 27, 2015), and the Final Application for Award of Compensation and

8    Reimbursement of Expenses of DGDK (Docket No. 375, filed on December 3, 2012) (the "Final

9    Fee Application") (the Second Interim Fee Applications, the Motion for Unpaid Final Fees and

10   the Final Fee Application are collectively referred to herein as the "Applications") came on

11   regularly for hearing on the above date and time before the Honorable Ernest M. Robles, United

12   States Bankruptcy Judge.  EBG, BRG and DGDK submitted on the tentative rulings granting the

13   Applications, and no appearances were made at the hearing.

14        The Court, having considered the Applications, the declarations filed in support of the

15   Applications, no oppositions to the Applications having been filed, and good cause appearing,

16        IT IS ORDERED THAT:

17        1.    The Second Interim Fee Applications of EBG and BRG are granted.

18        2.    EBG is allowed fees of $1,692,377.00 and expenses of $62,489.94, for a total of

19   $1,754,866.94, as Chapter 7 administrative expenses on an interim basis for the period from

20   October 1, 2013 through June 30, 2015.

21        3.    The Trustee is authorized to pay EBG $1,000,000.00 (approximately 59%) of the

22   allowed interim fees and $62,489.94 (100%) of the allowed interim expenses forthwith.  The

23   remaining fees are to be held by the Trustee on behalf of the estate and paid upon further order of

24   the Court following a motion or application.

25        4.    BRG is allowed fees of $278,496.00 and expenses of $3,226.62, for a total of

26   $281,722.62, as Chapter 7 administrative expenses on an interim basis for the period from

27   November 1, 2013 through July 31, 2015.

28

1409864

2

5.       The Trustee is authorized to pay BRG $278,496.00 (100%) of the allowed interim

fees and $3,226.62 (100%) of the allowed interim expenses forthwith.

6.       The Motion for Unpaid Final Fees of DGDK, and Final Fee Application of DGDK,

are granted.  DGDK is allowed fees of $210,402.50 (of which ~~$70,418.90~~ $70,064.03 has already

been paid) and expenses of $4,229.72 (of which $4,229.72 has already been paid), as Chapter 7

administrative expenses on a final basis.

7.       The Trustee is authorized to pay DGDK $140,338.47 in allowed but unpaid final

fees forthwith.

# # #

Date: October 6, 2015

Ernest M. Robles
United States Bankruptcy Judge

1409864

3